**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **BROCK BOUDREAUX, KHALED** | * | **CASE NO. 6:14-cv-02267** |
| **BARAKE, and MICHAEL** | * | |
| **AINSWORTH, Individually and on** | * | |
| **Behalf of All Others Similarly Situated,** | * | **JUDGE ROBERT SUMMERHAYS** |
| | * | |
| | * | **MAGISTRATE JUDGE WHITEHURST** |
| **v.** | * | |
| | * | |
| **SCHLUMBERGER TECHNOLOGY** | * | |
| **CORPORATION** | | |

---

**DEFENDANT SCHLUMBERGER TECHNOLOGY CORPORATION'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY**
**JUDGMENT AS TO INDIVIDUAL PLAINTIFF GADI OGBOGU**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................... iii

OVERVIEW ................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 1

LAW AND ARGUMENT ................................................................................................ 7

    **A.**   LEGAL STANDARD FOR SUMMARY JUDGMENT. ........................................ 7

    **B.**   STC PROPERLY CLASSIFIED OGBOGU AS EXEMPT FROM OVERTIME
    PURSUANT TO THE HIGHLY COMPENSATED EMPLOYEE EXEMPTION. ...................... 8

        **1.**   Requirements of the Highly Compensated Employee (the "HCE") Exemption. ............... 10

        **2.**   Ogbogu's Compensation Satisfies Both the Total Compensation and Minimum Weekly
        Salary Requirements for the HCE. ....................................................................... 11

        **3.**   Obgobu's Work During the Relevant Period Was Non-Manual in Nature. ....................... 12

        **4.**   Ogbogu Customarily and Regularly Performed Exempt Duties or Responsibilities. .......... 15

CONCLUSION ............................................................................................................. 19

CERTIFICATE OF SERVICE ..................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279 (5th Cir. 2014) ................................. 10

*Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678 (S.D. Tex. 2012)................................. 14

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ......................................................... 7

*Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007) ......................................................... 8

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536 (5th Cir. 2005) .................................... 7, 8

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) ..................................................... 10

*Carranza v. Red River Oilfield Servs., LLC*, No. 15-3631, 2017 WL 1196215 (S.D. Tex. Mar. 31, 2017)................................................................................. 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 7

*Cunningham v. Advantix Digital, LLC*, No. 3:19-CV-0210, 2020 WL 1915693 (N.D. Tex. Apr. 20, 2020)................................................................................. 10

*Dean v. Newsco Int'l Energy Servs., USA, Inc.*, No. 4:15-CV-03406, 2019 WL 3566726 (S.D. Tex. Aug. 6, 2019) ......................................................................... 12

*Encino v. Motorcars, LLC v. Navarro*, 138 S.Ct. 1134 (2018) ................................... 8

*Fields v. City of S. Houston, Tex.*, 922 F.2d 1183 (5th Cir. 1991)................................. 7

*Goulas v. LaGreca,* No. 12-898, 2013 WL 2477030 (E.D. La. June 7, 2013) ............................. 13

*In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910 (D. Minn. 2010) ..................... 15

*Karna v. BP Corp. N. Am.*, No. 12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) ........... 15

*Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005)................................. 17

*Lansford v. RedZone Coil Tubing, LLC*, No. 17-CV-0225, 2019 WL 4999059 (W.D. Tex. July 2019)................................................................................. 15

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ............................................. 8

*Mamola Mfg. Serv., Inc.*, No. 08-1687, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010) .................. 16

*McLendon v. Schlumberger Tech. Corp.*, No. 4:15-cv-752-JLH (E.D. Ark. Mar. 13, 2018)....... 14

*McPherson v. LEAM Drilling Sys., LLC*, No. 14-02361, 2015 WL 1470554 (S.D. Tex. Mar. 30, 2015)................................................................................. 13

*Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015) ..................... 7, 8

*Olibas v. Barclay*, 838 F.3d 442 (5th Cir. 2016) .......................................................... 10

*Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (5th Cir. 2019) ........................... 8, 9

*Pruneda v. Xtreme Drilling & Coil Servs., Inc.*, No. 5:16-CV-091-DAE, 2017 WL 3023214 (W.D. Tex. June 20, 2017) ........................................................................................ 15

*Pruneda v. Xtreme Drilling Coil Serv., Inc.*, No, 16-091, 2017 WL 3023214 (W.D. Tex. June 6, 2017) ........................................................................................................................ 14, 16

*Pye v. Oil States Energy Servs., LLC*, No. 15-678, 2017 WL 1944564 (W.D. Tex. Jan. 13, 2017) ........................................................................................................................................ 7

*Smith v. Ochsner Health Sys.*, 956 F.3d 681 (5th Cir. 2020) ................................................ 11, 16

*Smith v. Ochsner Health System*, 956 F.3d 681 (5th Cir. April 17, 2020) ................................ 14

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009) ........................................ 7

*Trahan v. Honghua Am., LLC*, No. 11-2271, 2013 WL 2617894 (S.D. Tex. June 10, 2013) ...... 15

*Trent v. Wade*, 776 F.3d 368 (5th Cir. 2015) ............................................................................ 7

*Zannikos v. Oil Inspections (U.S.A.) Inc.*, No. 12-2508, 2014 WL 12771511 (S.D. Tex. Jan 30, 2014) ...................................................................................................................................... 18

*Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349 (5th Cir. 2015) ............................ 13

**Statutes**

29 U.S.C. § 202 ........................................................................................................................ 10

29 U.S.C. § 207 ........................................................................................................................ 10

**Regulations**

29 C.F.R. § 541.200 ................................................................................................................ 16

29 C.F.R. § 541.201 ...................................................................................................... 10, 16, 18

29 C.F.R. § 541.202 .......................................................................................................... 10, 17

29 C.F.R. § 541.205 ................................................................................................................ 16

29 C.F.R. § 541.601 .................................................................................................. 11, 12, 15, 16

29 C.F.R. § 541.701 ................................................................................................................ 16

Defendant Schlumberger Technology Corporation ("STC" or "Defendant") submits its Memorandum in Support of Its Motion for Summary Judgment as to Individual Plaintiff Gadi Ogbogu ("Ogbogu").

## OVERVIEW

Ogbogu was a highly compensated employee whose primary duties were non-manual, and he customarily and regularly performed at least one exempt function under the Administrative Exemption.  His annual compensation exceeded $100,000 per year, of which over $455 per week was paid on a salary basis.  As a Directional Driller ("DD"), Ogbogu customarily and regularly performed non-manual duties directly related to the general business operations of STC's customers.  Specifically, as the DD located at the drilling rig, Ogbogu was the expert on directional drilling, constantly providing direction, supervision, and advice to rig crew supervisors and personnel in performing the directional drilling operation.  As such, he was continuously providing advice and consultation on matters directly related to the general business operations of STC's client, among other administrative duties.

## FACTUAL BACKGROUND

Ogbogu received a bachelor's degree in electrical engineering in 2006.[1]  He followed this with a master's degree in petroleum engineering in 2013.[2]  At the time of his deposition, he was working on a doctorate in electrical engineering which he hoped to achieve by 2020.[3]

Ogbogu began his employment with STC on July 25, 2006.[4]  He worked in the field, (*i.e.*, at a customer's rig site), as a Measurement While Drilling Engineer ("MWD") from 2006 through

---

[1]     Deposition of Gadi Ogbogu ("Ogbogu Depo."), at p. 11.  A copy of the relevant excerpts of the Ogbogu Depo. are attached as Exhibit 1.
[2]     Ex. 1, Ogbogu Depo., at p. 12.
[3]     *Id.*
[4]     Ex. 1, Ogbogu Depo., at pp. 17-18.

2009.[5]  Beginning on July 1, 2009, Ogbogu was assigned to and worked as a member of STC's Operations Support Center (the "OSC").[6]  While working in the OSC, Ogbogu provided support to MWDs in the field.[7]  Ogbogu's time working in the OSC ended on or about November 3, 2013.[8]

Despite working in the OSC and providing support to MWDs in the field, as of March 12, 2011, Ogbogu's job title became "GFE – DD."[9]  It was around this time that Ogbogu attended STC's directional drilling school, and his job title changed to GFE – DD.[10]  After attending DD school and having his job title changed to DD, Ogbogu went back to working in the OSC providing support to MWDs working in the field.[11]

Ogbogu left the OSC in November 2013 and transitioned to working in the field providing DD services for the first time.[12]  He continued to perform these services until March 2015, when he was laid off as part of a reduction in force.[13]  Ogbogu was paid on a salary basis.[14]  He received that same bi-weekly salary regarding how much he worked, and even if he did not work an entire week.[15]  Other than such things as insurance, 401(k) contributions, and taxes, he never had any deductions taken from his salary.[16]  Ogbogu never told his manager or Human Resources that he believed he should have received overtime.[17]

---

[5]      Ex. 1, Ogbogu Depo., at pp. 17-18.
[6]      Ex. 1, Ogbogu Depo., at p. 18.
[7]      Ex. 1, Ogbogu Depo., at pp. 49-50.  As part of the settlement of the MWD class, all MWD claims were dismissed with prejudice by the Court on August 30, 2019. Dkt. No. 464.
[8]      Ex. 1, Ogbogu Depo., at p. 18.
[9]      Ex. 1, Ogbogu Depo., at 24; Declaration of B. Marroquin ("Marroquin Decl."), attached as Exhibit 2, at ¶ 5 & attached ex. 2-1.
[10]     Ex. 1, Ogbogu Depo., at p. 28.
[11]     Ex. 1, Ogbogu Depo., at p. 62.
[12]     Ex. 1, Ogbogu Depo., at pp. 18-19.
[13]     Ex. 1, Ogbogu Depo., at p. 19.
[14]     Ex. 1, Ogbogu Depo., at p. 35.
[15]     Ex. 1, Ogbogu Depo., at p. 35.
[16]     Ex. 1, Ogbogu Depo., at pp. 35-36.
[17]     Ex. 1, Ogbogu Depo., at p. 39.

When Ogbogu worked in the OSC, his annual salary was $68,300 per year, or $1,311.58 per week.[18]   When he returned to field work as a DD, his annual salary remained at the same level.[19]   He remained at that salary level until shortly before his termination in March 2015, when his salary was reduced to $57,096 annually, or $1,115.31 per week.[20]   In 2012, his total compensation was $216,948.24.[21]   In 2013 his total compensation was $200,853.00.[22]   In 2014 his total compensation was $202,066.08.[23]   His total compensation through March 2015 was $55,554.50.[24]

Ogbogu's primary function when he was working in the OSC was to provide support for the MWD tools, surface system, and computers.[25]   If an MWD in the field had a problem, he would call and consult with Ogbogu to get the tool working properly again.[26]   While working in the OSC, Ogbogu served as a "second set of eyes" for the MWD on the well site.[27]   If Ogbogu saw an issue crop up with the data he was receiving, he would call the MWD to find out what was going on and to work through any issues.[28]   Ogbogu prepared reports on "lessons learned" and guidelines for people in the field based on what he saw in the OSC.[29]

Ogbogu began working in the field and providing DD services in November 2013.[30] Ogbogu agreed that his job can be summarized as planning, executing, and managing all phases

---

[18]   Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[19]   Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[20]   Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[21]   Ex. 2, Marroquin Decl., at ¶ 6 & attached ex. 2-2.
[22]   Ex. 2, Marroquin Decl., at ¶ 7 & attached ex. 2-3.
[23]   Ex. 2, Marroquin Decl., at ¶ 8 & attached ex. 2-4.
[24]   Ex. 2, Marroquin Decl., at ¶ 9 & attached ex. 2-5.
[25]   Ex. 1, Ogbogu Depo., at pp. 49-50.  *See also* Declaration of M. F. van Vliet, attached as Exhibit 3, at ¶ 18.
[26]   Ex. 1, Ogbogu Depo., at pp. 49-50.
[27]   Ex. 1, Ogbogu Depo., at p. 52.
[28]   Ex. 1, Ogbogu Depo., at p. 52.
[29]   Ex. 1, Ogbogu Depo., at p. 54.
[30]   Ex. 1, Ogbogu Depo., at pp. 57-60 and attached exhibit 3.

of the directional drilling job to deliver services that meet client expectations and D&M, (STC Drilling and Measurements), standards.[31]

When he returned to the field as a DD, he immediately "took the reins."[32]  His work for STC's clients whose business involved creating wells that would produce oil and gas.[33]  As a DD, he was not physically controlling the Bottom Hole Assembly ("BHA," the bottom of the drill string where the drill bits, tools, and sensors are located).[34]  Controlling the BHA was the job of the Driller, a rig supervisor.[35]  Ogbogu's job was to provide instruction to the Driller on how to orient and steer the BHA to stay in the well plan.[36]  The Driller followed his instructions.[37]  Ogbogu never actually operated the controls.[38]

Before going to the rig, Ogbogu would participate in a pre-spud meeting between STC and the customer.[39]  Once at the rig site, he would check in with the Company Man, the rig manager, and make sure they were on the same page.[40]  He would then inventory his equipment as part of his job was managing the inventory and ordering needed items.[41]  Next, he prepared for the crew to "pick up" the BHA.[42]

---

[31]    Ex. 1, Ogbogu Depo., at p. 57 and attached exhibit 3.
[32]    Ex. 1, Ogbogu Depo., at p. 63.
[33]    Ex. 1, Ogbogu Depo., at pp. 73-78.  *See also* Deposition of L. Kuwertz ("Kuwertz Depo."), attached as Exhibit 4, at p. 306.
[34]    Ex. 1, Ogbogu Depo., at pp. 73-74.
[35]    Ex. 1, Ogbogu Depo., at pp. 73-75. *See also* Ex. 4, Kuwertz Depo., at pp. 275, 276-77.
[36]    Ex. 1, Ogbogu Depo., at pp. 73-75.  *See also* Ex. 3, van Vliet Decl., at ¶ 13; Ex. 4, Kuwertz Depo., at pp. 207-208.
[37]    Ex. 1, Ogbogu Depo., at pp. 73-75.
[38]    Ex. 1, Ogbogu Depo., at pp. 73-75.
[39]    Ex. 1, Ogbogu Depo., at pp. 78-79.  *See also* Ex. 3, van Vliet Decl., at ¶ 9; Ex. 4, Kuwertz Depo., at pp. 115, 119-120.
[40]    Ex. 1, Ogbogu Depo., at pp. 75-79.  *See also* Ex. 3, van Vliet Decl., at ¶ 10; Ex. 4, Kuwertz Depo., at p. 123.
[41]    Ex. 1, Ogbogu Depo., at pp. 77-78.  *See also* Ex. 3, van Vliet Decl., at ¶ 10; Ex. 4, Kuwertz Depo., at p. 123.
[42]    Ex. 1, Ogbogu Depo., at pp. 75-80.  *See also* Ex. 3, van Vliet Decl., at ¶ 11.

The rig crew physically assembled all the components of the BHA.[43]  While the rig crew did so, Ogbogu monitored different gauges to make sure the rig crew performed this job in a safe manner.[44]  Based on Ogbogu's experience, the DD job involved very limited manual labor.[45]

After the BHA is put together, Ogbogu observed the rig crew putting the BHA into the hole.[46]  Ogbogu's role is to make sure the rig crew assembled the BHA properly and included all of the required components as they "pick up" the BHA.[47]  Before the drilling begins, Ogbogu runs the shallow hole test to ensure the equipment is running properly.[48]  Once the drilling begins, Ogbogu is monitoring the drilling parameters, rate of penetration, flow rates, inclination, and azimuth.[49]

As a DD, Ogbogu monitored various drilling parameters in real time, and, as drilling conditions changed, he would instruct the driller to adjust the drilling parameters.[50]  If the monitors indicated that the drill was straying from the well path, he was responsible for instructing the driller on how to adjust the drill so that the wellbore remained consistent with the well plan.[51]  If there were issues, he would address those directly with the Company Man.[52]  Ogbogu used his experience, the real time performance of the BHA, and past results of the well (or trends) to decide how to slide to stay within the parameters.[53]

---

[43]     Ex. 1, Ogbogu Depo., at p. 76; *See also*, Ex. 4, Kuwertz Depo., at 123-125, 273, 275; Ex. 3, van Vliet Decl., at ¶ 11.
[44]     Ex. 1, Ogbogu Depo., at p. 76.  *See also* Deposition of M. F. van Vliet Depo., Vol. II ("van Vliet Depo., Vol. II"), attached as Exhibit 5, at pp. 124-125.
[45]     Ex. 1, Ogbogu Depo., at p. 79.
[46]     Ex. 1, Ogbogu Depo., at pp. 79-80.  *See also* Ex. 3, van Vliet Decl., at ¶ 11.
[47]     Ex. 1, Ogbogu Depo., at p. 80.
[48]     Ex. 1, Ogbogu Depo., at pp. 80-81.  *See also* Ex. 3, van Vliet Decl., at ¶ 12.
[49]     Ex. 1, Ogbogu Depo., at pp. 80-85.  *See also* Ex. 3, van Vliet Decl., at ¶ 13.
[50]     Ex. 1, Ogbogu Depo., at pp. 80-85.  *See also* Ex. 4, Kuwertz Depo., at pp. 208-209, 275, 278-279.
[51]     Ex. 1, Ogbogu Depo., at pp. 80-85.  *See also* Ex. 4, Kuwertz Depo., at pp. 40-41, 207-209, 214, 220, 278-279; Ex. 5, van Vliet Depo., Vol. II, at pp. 6-8; 91-92, 95-96.
[52]     Ex. 1, Ogbogu Depo., at pp. 69-70.
[53]     Ex. 1, Ogbogu Depo., at pp. 93-95.  *See also* Ex. 4, Kuwertz Depo., at pp. 206-208, 278-279.

As the DD, Ogbogu received surveys from the MWD that pinpointed the BHA's location underground, and Ogbogu used those surveys to make steering adjustments and decisions.[54]  If the data that the MWD provided differed significantly from the expected data, he would instruct the MWD to conduct another survey.[55]  If Ogbogu had anti-collision concerns, he would instruct the MWD to take surveys more frequently to see if they were coming close to a nearby well.[56]

Ogbogu predicted which way the BHA would move by using information regarding the formation, the zone, the hole, the motor, etc.[57] There is no standard operating procedure ("SOP") or checklist to follow regarding corrective action to get back on a well path.[58]  It was his responsibility to make sure that they were getting the required curve.[59]  When making steering decisions Obgobu also considered other variables.  For example, he had to consider whether his steering instructions would result in "doglegs" in the wellbore.[60]  That was an important consideration because severe doglegs in the wellbore could impact future work on the well.[61]  After the DD completes his role, a completion crew then runs pipe down into the wellbore (which is also referred to as "running casing").[62]  Severe or multiple doglegs could prevent the completion crew from running casing into the wellbore.[63]

---

[54]     Ex. 1, Ogbogu Depo., at pp. 93-95.
[55]     Ex. 1, Ogbogu Depo., at pp. 93-95.
[56]     Ex. 1, Ogbogu Depo., at pp. 90-93.  *See also* Ex. 4, Kuwertz Depo., at p. 120; Ex. 5, van Vliet Depo., Vol. II, at pp. 7-8.
[57]     Ex. 1, Ogbogu Depo., at pp. 80-85.
[58]     Ex. 1, Ogbogu Depo., at pp. 93-95.  *See also* Ex. 4, Kuwertz Depo., at p. 215.
[59]     Ex. 1, Ogbogu Depo., at pp. 85-91.
[60]     Ex. 1, Ogbogu Depo., at p. 93.
[61]     Ex. 1, Ogbogu Depo., at p. 93.
[62]     Ex. 1, Ogbogu Depo., at pp. 93-95.
[63]     Ex. 1, Ogbogu Depo., at pp. 93-95.

## LAW AND ARGUMENT

### A. LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment motions permit the Court to resolve a lawsuit, or individual legal issues/claims in a lawsuit, without the necessity of a trial if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law. *See Pye v. Oil States Energy Servs., LLC*, No. 15-678, 2017 WL 1944564, at *3 (W.D. Tex. Jan. 13, 2017) (citing *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir. 1991)). "Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

"Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (emphasis added).

In 2018, the United States Supreme Court expressly rejected the principle applied by courts that exemptions to overtime pay requirements should be construed narrowly.  *Encino v. Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018). The Court explicitly stated: "[t]he Ninth Circuit also invoked the principle that exemptions to the FLSA should be construed narrowly.  We reject this principle as a useful guidepost for interpreting the FLSA."  *Id.*  Thus, according to the U.S. Supreme Court, exemptions must be given a fair reading, as opposed to subjecting employers to a heightened burden under the overruled narrow-construction principle.  *Id.*

## B.  STC PROPERLY CLASSIFIED OGBOGU AS EXEMPT FROM OVERTIME PURSUANT TO THE HIGHLY COMPENSATED EMPLOYEE EXEMPTION.

The Fifth Circuit previously examined the DD position in *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (5th Cir. 2019).  Although the issue in that case was independent contractor status, many of the facts and portions of the Fifth Circuit's analysis are analogous and instructive in this case.

Premier both employed and contracted with non-employee DDs.  *Id.* at 376.  Its employee DDs were paid a salary plus a day bonus for each day they were on the job.[64]  *Id.*  The DDs were

---

[64] Plaintiffs' counsel Richard J. (Rex) Burch was also counsel for the *Premier* plaintiffs, but the employee DDs were not included in the case.

supervised by a "coordinator" but performed their task with little or no intervention.  *Id.*  The DDs served as advisors on how to perform the directional drilling operation.  *Id.*  The DDs used measurements taken by MWDs to form the basis of their opinions.  *Id*. at 375.  An error in the advice given by the DD can lead to the company losing a significant amount of money, sometimes hundreds of thousands of dollars.  *Id.*

The Fifth Circuit reviewed the facts against the five-factor test for independent contractors and found that Premier was entitled to summary judgment.  In finding that the "degree of control factor" weighed in favor of independent contractor status, the Court focused on the level/degree of supervision over the DDs.  The Court noted that although the DDs were provided with a well plan, the DDs made the plan work.  *Id.* at 381-82.  Premier did not dictate how the DDs completed the directional drilling calculations.  *Id.*at 381.  The Court also found that "skill and initiative" factor supported classification as an independent contractor.  "The district court correctly noted that plaintiffs 'are highly skilled individuals who perform their directional drilling tasks using their own discretion.'"  *Id.* at 386.

The same can be said for Ogbogu.  He was not a roughneck hired to perform manual work.  His job was to advise regarding the directional drilling operation.[65]  His job was to plan, manage and execute all phases of the directional drilling job.[66]  Ogbogu had to predict how the BHA would react based upon its location, the nature of the particular stratum of the formation was in and variable such as pump speed, rate of rotation and rate of penetration.[67]  These decisions were based

---

[65]     Deposition of M. F. van Vliet, Volume I ("van Vliet Depo., Vol. I"), attached as Exhibit 6, at p. 150; Ex. 4, Kuwertz Depo., at pp. 49, 111, 128, 216, 278-279, 306.
[66]     Ex. 1, Ogbogu Depo., at p. 57 and attached exhibit 3; Ex. 6, van Vliet Depo., Vol. I, at p. 150.
[67]     Ex. 1, Ogbogu Depo., at p. pp. 80-85.

both on the measurements given to him by the MWD and his judgment as to how the formation was responding to his changes.[68]

The Court's finding that DDs were expert advisors for the directional drilling operation directly supports a finding in this case that DDs perform an administrative function.  Advisors and consultants are among the jobs specifically found to be exempt under the regulations.  *See* 29 C.F.R. § 541.201(c).  Similarly, the Court's findings regarding the exercise of discretion support the administrative requirement for discretion and judgment as to matters of significance.  29 C.F.R. § 541.202(a).

### 1.    Requirements of the Highly Compensated Employee (the "HCE") Exemption.

The FLSA established minimum labor standards in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  The statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."  *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945).  This typically includes paying "overtime compensation to any employee working more than forty hours in a week."  *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (quoting *Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 282 (5th Cir. 2014) (citing 29 U.S.C. § 207(a)(1))).  However, the FLSA provides exemptions to the overtime requirements including an exemption for highly compensated employees.  *Cunningham v. Advantix Digital, LLC*, No. 3:19-CV-0210, 2020 WL 1915693, at *16 (N.D. Tex. Apr. 20, 2020).

---

[68]    Ex. 1, Ogbogu Depo., at pp. 80-85, 93-95.

An FLSA plaintiff is properly classified under the HCE if he: (1) earns total annual compensation of at least $100,000.00 (which must include at least $455.00 per week paid on a salary or fee basis); (2) customarily and regularly performs any one of the exempt duties of an executive, administrative, or professional employee; and (3) primarily performs office or non-manual work.  29 C.F.R. § 541.601; *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020).   According to the DOL, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c).  Indeed, "[i]n crafting the [HCE], the Department of Labor made it easier on both employers and courts."  *Smith*, 956 F.3d at 688.  The employee's "level of compensation is the principal consideration." *Id*.

With respect to determining whether an employee's compensation satisfies the HCE exemption's requirements, total annual compensation may include commission payments, nondiscretionary bonuses, and other nondiscretionary compensation.  29 C.F.R. § 541.601(b)(1). If the employer does not define the applicable year in advance, the calendar year applies.  29 C.F.R. § 541.601(b)(4).  Finally, if an employee does not work a full year, he may still qualify for the HCE if the employee receives a *pro rata* portion of the minimum" required total annual compensation. 29 C.F.R. § 541.601(b)(3).

### 2. Ogbogu's Compensation Satisfies Both the Total Compensation and Minimum Weekly Salary Requirements for the HCE.

Ogbogu was paid on a salary basis.[69]  (Ex. 1 at 35.)  He received that same bi-weekly salary regarding how much he worked, and even if he did not work an entire week.[70]  Other than such

---

[69]     Ex. 1, Ogbogu Depo., at p. 35.  *See also* Ex. 5, van Vliet Depo., Vol. II, p. 132.
[70]     Ex. 1, Ogbogu Depo., at p. 35

things as insurance, 401(k) contributions, and taxes he never had any deductions taken from his salary.[71]

Ogbogu undoubtedly met the salary requirements for the HCE exemption. Ogbogu's annual salary was $68,300 per year, or $1,311.58 per week.[72] He remained at that salary level until shortly before his termination in March 2015, when his salary was reduced to $57,096 annually, or $1,115.31 per week.[73] In 2012, his total compensation was $216,948.24.[74] In 2013 his total compensation was $200,853.00.[75] In 2014 his total compensation was $202,066.08.[76]

Ogbogu's last day of employment was March 8, 2015, and, using this date, STC employed Ogbogu for approximately ten weeks.[77] During those ten weeks, Ogbogu earned $55,554.50.[78] On a pro-rated basis, an employee must earn at least $1,923.08 a week to reach the annual compensation requirement of $100,000. Ogbogu earned $5,555.45 per week in 2015 and therefore satisfies the HCE's total annual compensation requirement for 2015. *See Dean v. Newsco Int'l Energy Servs., USA, Inc.*, No. 4:15-CV-03406, 2019 WL 3566726, at *12 (S.D. Tex. Aug. 6, 2019) (citing 29 C.F.R. § 541.601(b)(3)).

### 3.    Obgobu's Work During the Relevant Period Was Non-Manual in Nature.

As a DD in the field, Ogbogu's job duties were non-manual in nature. For example, the rig crew physically assembled all the components of the BHA.[79] While the rig crew did so, Ogbogu was looking at gauge to ensure that the rig crew performed this task properly and safely.[80]

---

[71]    Ex. 1, Ogbogu Depo., at pp. 35-36.
[72]    Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[73]    Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[74]    Ex. 2, Marroquin Decl., at ¶ 6 & attached ex. 2-2.
[75]    Ex. 2, Marroquin Decl., at ¶ 7 & attached ex. 2-3.
[76]    Ex. 2, Marroquin Decl., at ¶ 8 & attached ex. 2-4.
[77]    Ex. 2, Marroquin Decl., at ¶ 5 & attached ex. 2-1.
[78]    Ex. 2, Marroquin Decl., at ¶ 9 & attached ex. 2-5.  To note, exhibit 2-5 to the Marroquin Decl. contains data that STC produced in documents bearing Bates stamp D-000435 through D-000436, and the presentation of the data from those Bates stamped documents has been changed so that it is easier to review in connection with this motion.
[79]    Ex. 1, Ogbogu Depo., at p. 76. *See also*, Ex. 4, Kuwertz Depo., at 123-125, 273, 275.
[80]    Ex. 1, Ogbogu Depo., at p. 76.

Ogbogu never actually drilled STC's client's well as he never operated the controls.[81]  Ogbogu testified that he only performed a minimal amount of manual labor:

> Q:    Okay.  As part of your job as -- when you were a directional
>       driller, was there any manual labor involved with your job?
> A:    Minor, minor level.
> Q:    Minor, okay.
> A:    Minimum.[82]

Courts in the Fifth Circuit have specifically concluded that the work performed by specialists in the oil and gas industry assigned to work in the field at the client well site, such as Ogbogu, does **not** constitute manual or blue-collar work.  *See*, *e.g.*, *McPherson v. LEAM Drilling Sys., LLC*, No. 14-02361, 2015 WL 1470554, at *12 (S.D. Tex. Mar. 30, 2015) (finding that the limited manual work performed by MWDs does not satisfy the blue-collar exclusion).

Moreover, the mere fact that an exempt employee performs *some* manual work does not convert that employee to a non-exempt laborer.  In *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 353-54 (5th Cir. 2015), the plaintiffs, marine superintendents, argued that the district court erred in finding that they performed non-manual work as they inspected cargo tanks to ensure the absence of contaminants, inspected onshore tank placement to ensure it was correctly placed, inspected loading and discharge equipment, and examined fluid flow through the line to ensure that no oil was lost during oil transfers.  Concluding that the plaintiff's primary duties included supervision, quality control, and ensuring compliance with applicable standards, the court affirmed the district court's ruling that the plaintiff was properly classified as exempt under the HCE.  As the issue was the highly compensated exemption, the defendant did not need to show that plaintiff exercised other exempt duties such as exercising independent judgment and discretion.  *See also Goulas v. LaGreca,* No. 12-898, 2013 WL 2477030, at *9 (E.D. La. June 7, 2013), *aff'd sub nom.*

---

[81]    Ex. 1, Ogbogu Depo., at p. 73-75.  *See also* Ex. 5, van Vliet Depo., Vol. II, at p. 97.
[82]    Ex. 1, Ogbogu Depo., at p. 79.

*Goulas v. LaGreca Servs., Inc.*, 557 F. App'x 337 (5th Cir. 2014) (superintendent of horizontal drilling crew was exempt executive "despite the inclusion of manual labor in his regular duties"); *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 695 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014) (coil tubing supervisor was exempt executive even though he "also performed manual labor alongside the [technicians] he supervised while in the field"); *Pruneda v. Xtreme Drilling Coil Serv., Inc.*, No, 16-091, 2017 WL 3023214, at *7 (W.D. Tex. June 6, 2017) (finding service supervisors were exempt highly compensated executive employees even though they occasionally did non-exempt physical work with the well site equipment).

And in *Smith v. Ochsner Health System*, 956 F.3d 681 (5th Cir. 2020), the defendant also argued that the plaintiff was exempt under the HCE exemption.  In his role as an organ procurement coordinator, the plaintiff in *Smith* was responsible for receiving calls about potential donations, intaking information, and presenting the information to the surgeon.  He also managed the literal procurement of the organs by transporting them and was responsible for making "the transport happen."  *Id*. at 687.  Recognizing that an "organ procurement coordinator" is "directly related to assisting with the running or servicing of the business" of performing transplant operations, the court affirmed the district court's finding that the plaintiff performed an exempt administrative duty.  As per *Zannikos*, there was no need to show other exempt duties.

Similarly, in *McLendon v. Schlumberger Tech. Corp.*, No. 4:15-cv-752-JLH (E.D. Ark. Mar. 13, 2018) (Doc. No. 58 at pp. 2-4), despite the plaintiff spending hours loading "guns" (metal tubes containing high explosives), *i.e.*, performing manual work, the court held that the plaintiff was exempt under the HCE, given that his primary duty was planning the job properly and supervising the proper execution at the well site.[83]

---

[83]    A copy of the court's decision in *McLendon v. Schlumberger Tech. Corp.* is attached as Exhibit 7.

And in *Pruneda*, 2017 WL 3023214, at *7, the plaintiffs, who served as service supervisors, claimed that they loaded and secured tools and equipment, physically inspected work trucks, set up equipment, rigged up the equipment, swung a hammer, leveled a well site, operated a forklift and winch, wiped down tools, cleaned up, examined the equipment, monitored gauges, repaired leaks, assisted their crew in operating the equipment, and made necessary repairs. Despite their performance of such manual work, the Court held that the plaintiffs were exempt HCE employees, where their "primary duty was management, as defined by the FLSA's implementing regulations." *Id.* at *7. *See also Lansford v. RedZone Coil Tubing, LLC*, No. 17-CV-0225, 2019 WL 4999059, at *3-4 (W.D. Tex. July 2019) (finding that the performance of some manual labor did not preclude a finding that the plaintiff's primary duty was exempt).

Based on the foregoing case law and competent summary judgment evidence, Ogbogu's primary duty did not consist of manual or blue-collar labor within the meaning of the FLSA.

### 4.   Ogbogu Customarily and Regularly Performed Exempt Duties or Responsibilities.

The "primary duty" analysis, which applies when an employer seeks to prove that a lower paid position is exempt from the FLSA's overtime requirement under the administrative or executive exemptions, is ***not*** relevant to the analysis of whether an employee qualifies for the HCE. *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 943 (D. Minn. 2010); *see also Carranza v. Red River Oilfield Servs., LLC*, No. 15-3631, 2017 WL 1196215 at *3 (S.D. Tex. Mar. 31, 2017). The HCE does not require the Court to engage in a rigorous analysis of the Plaintiff's job duties. *Karna v. BP Corp. N. Am.*, No. 12-0101, 2013 WL 1155485, at *17 (S.D. Tex. Mar. 19, 2013); *see also Trahan v. Honghua Am., LLC*, No. 11-2271, 2013 WL 2617894, at *12 (S.D. Tex. June 10, 2013) (citing to 29 C.F.R. § 541.601(c)). Under the HCE exemption, it is not necessary to prove that an employee performed each requirement of the executive, administrative

or professional exemptions.  *See, e.g.*, *Smith*, 956 F.3d at 684; *Mamola Mfg. Serv., Inc.*, No. 08-1687, 2010 WL 1433491, at *12 (D. Ariz. Apr. 9, 2010).

Instead, the Court need only find that a highly compensated employee customarily and regularly[84] performs (it need not find it to be the employee's primary duty) ***only one*** of the exempt duties or responsibilities of an executive, administrative, or professional employee.  *See* 29 C.F.R. § 541.601(a) (emphasis added); *Smith*, 956 F.3d at 684; *Pruneda*, 2017 WL 3023214, at *12 (citing 29 C.F.R. § 541.601(c) ("An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100.")).

The duties of an exempt administrative employee include performing "non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  The phrase "directly related to the management or business operations" refers to the type of work performed by the employee.  29 C.F.R. § 541.201(a).  Administratively exempt employees are those "whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."  29 C.F.R. §§ 541.201(a), 541.205(a).  The regulations specifically identify quality control and safety as administrative duties qualifying for the exemption.  29 C.F.R. § 541.201(b).  Further, an employee who serves as an advisor and consultant to an employer's customers will also qualify for the exemption.  29 C.F.R. § 541.201(c).

---

[84]    In this context, "customarily and regularly performs" means greater than occasional but may be less than constant and includes "work normally and recurrently performed every workweek," but not "isolated or one-time tasks." 29 C.F.R. § 541.701.

While working in the field as a DD, there is no dispute that Ogbogu's work directly relates to the general business operations of STC's customer. *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 373 (7th Cir. 2005) (distinguishing workers on the production line from those that "spot trouble in advance and decide what steps to take."). The customers were oil and gas exploration and development companies whose primary business was creating wells that would produce oil or natural gas.[85] The DD position, according to Ogbogu, can be summarized as planning, executing, and managing all phases of the directional drilling job to deliver services that meet client expectations.[86] In the field, Ogbogu customarily and regularly performed as an advisor and consultant to STC's customers.[87] For example, Ogbogu's job as a DD was to provide instruction to the Driller on how to orient and steer the BHA to stay within the well plan.[88] The Driller followed his instructions.[89] Ogbogu never actually operated the controls, or, in other words, Ogbogu did not drill the well for the STC's client.[90] Such conduct constitutes affecting and implementing the customer's operating practices. *See* 29 C.F.R. § 541.202(b); *Harris v. Liberty Oilfield Serv., LLC*, No. 16-01116, 2018 WL 447355, at *4 (D. Colo. Jan. 17, 2018) (finding the field engineer on a fracking crew was exempt as he was an advisor and consultant to the client).

There can be no doubt that Ogbogu affected the customer's business operations to a substantial degree. As stated above, he directed and supervised the rig crew through the directional drilling operation, giving continuous input to the Driller as to the steps necessary to stay on plan. Without his guidance, the drilling operation could not be successful.[91]

---

[85]    Ex. 1, Ogbogu Depo., at pp. 73-75. *See also* Ex. 4, Kuwertz Depo., at p. 306.
[86]    Ex. 1, Ogbogu Depo., at p. 57 and attached exhibit 3. *See also* Ex. 6, van Vliet Depo., Vol. I, at p. 150.
[87]    *See generally* Ex. 5, van Vliet Depo., Vol. II, at pp. 7-8, 25; Ex. 6, van Vliet Depo, Vol. I, at p. 150; Ex. 4, Kuwertz Depo., at pp. 49, 111, 128, 216, 278-279, 306.
[88]    Ex. 1, Ogbogu Depo., at p. 74. *See also* Ex. 4, Kuwertz Depo., at 123, 125, 273, 275-279; Ex. 5, van Vliet Depo., Vol II, at pp. 96, 98.
[89]    Ex. 1, Ogbogu Depo., at p. 74.
[90]    Ex. 1, Ogbogu Depo., at p. 74. *See also* Ex. 5, van Vliet Depo., Vol. II, at p. 97.
[91]    Ex. 6, van Vliet Depo., Vol. I, at p. 153.

Ogbogu also continuously performed a significant quality control function.   Ogbogu inspected the surveys taken by the MWD and, if they appeared off, Ogbogu directed the MWDs to conduct another survey.[92] If the monitors indicated that the drill was straying from the well path, Ogbogu instructed the Driller on how to adjust the drill to remedy the situation.[93]

Ogbogu also had significant safety responsibilities, which are administrative duties.  *See* 29 C.F.R § 541.201(a).  While the rig crew is performing work under Ogbogu's supervision, he ensured that they were carrying out the task safely.[94]

Further, Ogbogu's supervision of the rig crew during the directional drilling operation was another administrative function.  *See Zannikos v. Oil Inspections (U.S.A.) Inc.*, No. 12-2508, 2014 WL 12771511, at *5 (S.D. Tex. Jan 30, 2014) (finding that the inspector's supervision of the customer's line blending operation was an administrative task).

In sum, Ogbogu admits that he customarily and regularly performed multiple exempt duties as a DD. These included duties that are critical to its client's projects by steering the well to land in the pay zone or reservoir, thereby creating a well that produces oil and/or gas for STC's clients.[95] As such, Ogbogu engaged in a multitude of duties that courts have found constitute administrative tasks, and are identified in the FLSA's regulations, which suffices to demonstrate that he customarily and regularly performed at least one administrative duty (numerous duties actually) and therefore, he is exempt under the HCE exemption from the FLSA overtime regulations.  *See Harris*, 2018 WL 447355, at *4-5 (holding that plaintiff's work related to the general business operations of the defendant and, more importantly, defendant's clients where plaintiff, the only

---

[92]    Ex. 1, Ogbogu Depo., at pp. 91-95.
[93]    Ex. 1, Ogbogu Depo., at pp. 80-85.  *See also* Ex. 4, Kuwertz Depo., at pp. 108, 119, 207-209, 278-279.
[94]    Ex. 1, Ogbogu Depo., at p. 76.  *See also* Ex. 5, van Vliet Depo., Vol. II, at 121; Ex. 4, Kuwertz Depo., at pp. 123, 125, 273, 275.
[95]    Ex. 1, Ogbogu Depo., at pp. 73-95.

field engineer at each drilling site, created real-time data reports that passed swiftly to the client representative at the site, often without a second layer of review, and had a direct effect on the design and implementation of the frac operation).

## CONCLUSION

For the foregoing reasons, STC respectfully submits that it is entitled to judgment as a matter of law because STC properly classified Ogbogu as exempt pursuant to the highly compensated employee exemption. Accordingly, the Court should grant STC's Motion for Summary Judgment and enter an order dismissing Ogbogu's claims, in their entirety, with prejudice.

*By: /s/ Robert P. Lombardi*

Samuel Zurik III (LA Bar #24716
Robert P. Lombardi (LA Bar #26387)
**THE KULLMAN FIRM, P.L.C.**
1100 Poydras Street, Suite 1600
New Orleans, LA  70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4189
E-Mail: sz@kullmanlaw.com
E-Mail: rpl@kullmanlaw.com


And


Kelly Reese (admitted *pro hac vice*)
**THE KULLMAN FIRM, P.L.C.**
63 S. Royal Street
1100 Riverview Plaza
Mobile, AL 36602
Telephone: (251) 432-1811
Facsimile: (251) 433-1230
E-Mail: kr@kullmanlaw.com

**ATTORNEYS FOR DEFENDANT,
SCHLUMBERGER TECHNOLOGY
CORPORATION**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of May 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to participating counsel of record and was served on counsel of record via email.

*/s/ Robert P. Lombardi*