# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

**BROCK P BOUDREAUX ET AL**

**VERSUS**

**SCHLUMBERGER TECHNOLOGY CORP**

**CASE NO.  6:14-CV-02267**

**JUDGE ROBERT R. SUMMERHAYS**

**MAGISTRATE JUDGE CAROL B. WHITEHURST**

## MEMORANDUM RULING

Presently before the Court are (1) Motion for Partial Summary Judgment Regarding Schlumberger's Exemption Defenses [ECF No. 552] filed by Plaintiffs; (2) Motion for Summary Judgment as to Plaintiff Hani Anklis [ECF No. 540] filed by defendant Schlumberger Technology Corp. ("Schlumberger" or "Defendant"); (3) Motion for Summary Judgment as to Plaintiff Michael Ainsworth [ECF No. 541] filed by Schlumberger; (4) Motion for Summary Judgment as to Plaintiff Gadi Ogbogu [ECF No. 542] filed by Schlumberger; (5) Motion for Summary Judgment as to Plaintiff Thomas Naron [ECF No. 543] filed by Schlumberger; (6) Motion for Summary Judgment as to Plaintiff Brian Dankowski [ECF No. 544] filed by Schlumberger; (7) Motion for Summary Judgment as to Plaintiff Joshua Eaton [ECF No. 545] filed by Schlumberger; (8) Motion for Summary Judgment as to Plaintiff James Davis [ECF No. 546] filed by Schlumberger; (9) Motion for Summary Judgment as to the Issues of Good Faith and Willfulness [ECF No. 534] filed by Schlumberger; and (10) Motion for Partial Summary Judgment as to Schlumberger's Good Faith Affirmative Defense [ECF No. 556] filed by Plaintiffs. Each of the motions is opposed.

1

# I.
## BACKGROUND

On July 8, 2014, Plaintiffs Brock Boudreaux and Khaled Barake filed the present Fair Labor Standards ("FLSA") collective action against Schlumberger asserting claims for unpaid overtime on behalf of Measurement While Drilling Operators ("MWDs") and Directional Drillers ("DD's").[1] On December 4, 2014, an amended complaint was filed by Boudreaux and Barake, and Michael Ainsworth was added.[2] Schlumberger filed an answer asserting various affirmative defenses.[3] Plaintiffs requested conditional certification of the FLSA claims under 29 U.S.C. § 216(b) and, on February 25, 2015, the Court entered an order granting conditional certification.[4] This order established two classes: MWDs and DDs.[5] The parties subsequently settled the claims of the MWD class.[6] The litigation has continued as to the DD class.

Schlumberger provides drilling and measurement services to oil and gas exploration development companies.[7] Directional drilling cells are recognized operational units with assigned responsibilities for its members in Schlumberger's manuals.[8] Schlumberger would create cells with the intent to regularly assign the same employees to work in the same cell for the same customer.[9] The Lead DD manages the cell, which normally consisted of two DDs and two MWDs.[10]

---

[1] ECF No. 1.
[2] ECF No. 27.
[3] ECF No. 29.
[4] *See* ECF No. 33 and 52.
[5] ECF No. 52.
[6] ECF No. 436.
[7] ECF No. 540, Ex. 1, Anklis Deposition., at 84.
[8] ECF No. 540, Ex. 3, van Vliet Declaration., at ¶ 7; Ex. 5, van Vliet Depo., Vol. II, at pp. 42-43.; Ex, 6, van Vliet Deposition, Vol. I, at 148.
[9] *Id.*, at Vol. II, at pp. 42, 128-129, 151-52.
[10] *Id.* at ¶ 8; Ex. 4, Kuwertz Deposition, at p. 297; Ex. 5, van Vliet Deposition, Vol. II, at p. 41.

# II.
## SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[11] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[13] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[14]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[15] "Credibility determinations are not part of the summary judgment analysis."[16] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

---

[11] Fed. R. Civ. P. 56(a).
[12] *Id.*
[13] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[14] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[15] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[16] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

existence of an element essential to that party's case, and on which that party will bear the burden of proof."[17]

# III.
## THE "WHITE COLLAR" EXEMPTIONS AND
## THE "SALARY BASIS" REQUIREMENT

Plaintiffs and Schlumberger have both moved for summary judgment with respect to Schlumberger's exemption defenses. The FLSA provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."[18] However, the FLSA provides that employers do not have to pay time and a half to individuals "employed in a bona fide executive, administrative, or professional capacity."[19] The statute does not define the scope of these exemptions but, instead, delegates authority to the Secretary of Labor to promulgate rules that define these exemptions.[20] The Secretary has issued regulations that exempt "highly compensated,"[21] as well as more modestly paid "executive," "administrative," and "professional" employees.[22] Schlumberger asserts three of these exemption defenses, namely, the (1) highly compensated employee ("HCE") exemption; (2) the administrative exemption; and (3) the executive exemption. Collectively, these three exemptions are often referred to as "white collar" exemptions.[23] If an employer claims "that the suing employee is exempt from the overtime

---

[17] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).
[18] 29 U.S.C. § 207(a)(1).
[19] 29 U.S.C. § 213(a)(1).
[20] 29 U.S.C. § 213(a)(1).
[21] 29 C.F.R. § 541.601.
[22] *Id.* at §§ 541.100, 541.200, 541.300.
[23] *Snively v. Peak Pressure Control, LLC*, 317 F. Supp. 3d 911 (W.D. Tex. 2018).

requirement," then the employer "has the burden of proving that the employee falls within the claimed exempted category."[24]

The HCE exemption applies to employees who earn over $100,000 in annual compensation, perform non-manual work, and regularly perform at least one of the exempt duties of an exempt executive, administrative or professional employee.[25] The administrative exemption applies to employees who earn a weekly salary of at least $455,[26] perform non-manual work related to the management or operations of the employer's customers, and exercise "discretion and independent judgment with respect to matters of significance."[27] The executive exemption applies to employees who manage a department or subdivision of Schlumberger, who regularly direct the work of at least two other employees, and whose recommendations as to the hiring and firing, advancement, or promotion of other employees are given weight.[28] Each of these three white collar exemptions requires that the employee be paid on "a salary basis" for the exemption to apply. In their motion for summary judgment, Plaintiffs argue that Schlumberger's pay structure does not satisfy this "salary basis" requirement and thus none of the exemptions are applicable as a matter of law.

As explained by the Fifth Circuit:

> To fall within any of these exemptions, however, three conditions must be met: First, the employee must meet certain criteria concerning the performance of executive, administrative, and professional duties. Second, the employee must meet certain minimum income thresholds. Finally, the employee must be paid on a "salary basis." And although the duties criteria and income thresholds vary from exemption to exemption, the regulations apply the same salary-basis requirement to all four exemptions. See *id.* § 541.100(a)(1) (applying the salary-basis test to executive employees); *id.* § 541.200(a)(1) (administrative employees); *id.* §

---

[24] *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636 (5th Cir.2001).
[25] 29 C.F.R. § 541.601(a).
[26] The amount of $455 per week was applicable for the relevant time periods but has since changed.
[27] 29 C.F.R. § 541.200(a).
[28] 29 C.F.R. § 541.100(a).

541.300(a)(1) (professional employees); *id.* § 541.601(b)(1) (highly compensated employees).

So earning a certain level of income is necessary, but insufficient on its own, to avoid the overtime protections of the FLSA. The employee must also be paid on a salary basis, as well as perform certain duties. And unless those tests are met, the employee is "not exempt ... no matter how highly paid they might be." Id. § 541.601(d) (emphasis added) (specifying various professions that are subject to overtime regardless of the amount of income earned).[29]

In *Hewitt*, the Fifth Circuit addressed whether an employee who was paid solely on a daily rate could satisfy the requirements of an HCE without satisfying the salary basis requirement.[30] There, the parties conceded that the plaintiff met the job duties requirement and the income thresholds but disputed whether the salary basis requirements must be met—specifically the guaranteed minimum component. The FLSA and its regulations define salary as compensation paid "on a weekly, or less frequent basis," "without regard to the number of days or hours worked."[31] If an employee's wages are computed on a daily rate, certain criteria must be met, namely:

An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.[32]

In *Hewitt*, the Fifth Circuit concluded that, since the plaintiff's compensation was based solely on a daily rate, this regulation applied.[33] Further, since the plaintiff was not guaranteed at least the minimum weekly requirement, the HCE exemption failed.[34] Plaintiffs in the present case argue

---

[29] *Hewitt v. Helix Energy Solutions Group, Inc.,* 15 F.4th 289, 290-291 (5th Cir. 2021).
[30] *Id.*
[31] 29 C.F.R § 541.602(a) & (a)(1).
[32] *Id.* § 541.604(b).
[33] 15 F.4th 289.
[34] *Id.*

that *Hewitt* is dispositive as far as Schlumberger's exemptions. They argue that, even if Plaintiffs

meet the guaranteed minimum requirement,[35] they do not satisfy the "reasonable relationship"

requirement found in the same regulation. Schlumberger, however, argues that the "reasonable

relationship" requirement does not apply in the present case. The Court agrees.

In *Hewitt*, the plaintiff's income was computed solely on the basis of a daily rate.[36] The

defendant in that case argued that the day rate paid to the plaintiff exceeded the required weekly

minimum and thus no further analysis was required. The Fifth Circuit disagreed, relying on the

fact that there simply was no guaranteed minimum requirement.[37] Here, the Plaintiffs are paid

under a *hybrid* compensation structure. Specifically, they are each paid an annual salary that is not

subject to reduction regardless of the numbers of hours or days worked. As to the specific

individual Plaintiffs named in the seven motions for summary judgment filed by Schlumberger,

that salary more than satisfies the requisite guaranteed minimum weekly salary requirement. These

employees were also provided additional compensation of a day rate paid for any day they are

present on a customer's rig. This day rate compensation generally accounts for the bulk of each

Plaintiffs' total compensation.

The distinction between the compensation structure in the current case and that found in

*Hewitt* is significant. Based on the compensation structure in the present case, the Plaintiffs' pay

is calculated "on a weekly, or less frequent basis"[38] and is not pay "computed on...a

daily...basis."[39] The significance of this distinction was addressed by the Fifth Circuit when it

---

[35] While the Court has evidence demonstrating that the guaranteed minimum requirement is met as to the seven individual Plaintiffs named in Schlumberger's motions, there is no specific evidence regarding the remaining Plaintiffs. Plaintiffs' motion simply seeks a finding that even if the guaranteed minimum requirement is met, the pay structure cannot meet the "reasonable relationship" test and therefore does not qualify as salary basis compensation.
[36] *Hewitt*, 15 F. 4th at 292.
[37] *Id.*, at 298.
[38] 29 C.F.R. § 541.602(a).
[39] *Id.* § 541.604(b).

explained that the *Hewitt* ruling was not in conflict with First[40] and Second[41] Circuit rulings on the issue:

> But there is no actual conflict here. That is for one simple reason that should be apparent from the face of the regulations: *Litz* and *Anani* involve pay calculated "on a weekly, or less frequent basis" (29 C.F.R. § 541.602(a))—and not pay "computed on ... a daily ... basis" (§ 541.604(b)). *See Litz*, 772 F.3d at 2 (employees were "guaranteed a minimum weekly salary of $1,000 *whether they bill[ed] any hours or not*") (emphasis added); *Anani*, 730 F.3d at 148 (employee's "base weekly salary was guaranteed, i.e. to be paid *regardless of the number of hours ... actually worked*") (emphasis added).
>
> Indeed, the Sixth Circuit has already distinguished *Litz* and *Anani* on precisely this textual ground. As that court explained, "*Anani* and *Litz* involved plaintiffs who ... were undisputedly guaranteed weekly base salaries above the qualifying level." *Hughes*, 878 F.3d at 189–90 (emphasis added).[42]

Moreover, the fact that the Plaintiffs were paid additional compensation by Schlumberger does not defeat the specific exemptions claimed by Schlumberger. Indeed, the regulations promulgated under the FLSA address this issue:

> An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis. Thus, for example, an exempt employee guaranteed at least $684 each week paid on a salary basis may also receive additional compensation of a one percent commission on sales. An exempt employee also may receive a percentage of the sales or profits of the employer if the employment arrangement also includes a guarantee of at least $684 each week paid on a salary basis. Similarly, the exemption is not lost if an exempt employee who is guaranteed at least $684 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off.[43]

---

[40] *Litz v. Saint Consulting Group, Inc.*, 772 F.3d 1 (1st Cir. 2014).
[41] *Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2nd Cir. 2013).
[42] *Hewitt*, 15 F.4th at 297.
[43] 29 C.F.R. § 541.604(a).

The Court, therefore, concludes that Schlumberger's compensation structure does not require application of the "reasonable relationship" test. Accordingly, one or more of the white collar exemptions may apply to Plaintiffs if Schlumberger establishes that the minimum weekly guaranteed compensation requirement has been met and that the job duties test is satisfied.

# IV.
## APPLICATION OF THE HCE EXEMPTION TO SEVEN PLAINTIFFS

Schlumberger next argues in its seven motions for summary judgment that the HCE exemption applies to seven (7) of the individual Plaintiffs—Hani Anklis, Michael Ainsworth, Gadi Ogbogu, Thomas Naron, Brian Dankowski, Joshua Eaton, and James Davis—as a matter of law based on the summary judgment record. As the Court previously ruled, Schlumberger's pay structure satisfies the "salary basis" requirement. The HCE exemption thus applies if these seven Plaintiffs satisfy the "job duties" requirement.

### A.      HCE Exemption "Job Duties" Requirement.

Under the FLSA, an employee falls into the HCE exemption if that employee (1) is annually compensated at least $100,000; (2) "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee;"[44] and (3) has within his or her primary duties the performing of office or non-manual work.[45] Plaintiffs do not dispute the compensation requirement of this exemption. However, the applicable regulation states that the "high level of compensation" that the HCE exemption requires is itself "a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."[46]

---

[44] 29 C.F.R. § 541.601(a).
[45] 29 C.F.R. § 541.601(d).
[46] 29 C.F.R. § 541.601(c).

The Fifth Circuit has explained the job duties requirement of the HCE exemption:

> The breadth of the HCE exemption is shown by the statement that an employee may be exempt even if "the employee does not meet all of the other requirements" for the underlying administrative, executive, or professional exemption. § 541.601(c). The regulation includes an example of an exempt executive HCE, who can be an "employee [who] customarily and regularly directs the work of two or more other employees." *Id.* Notably, this hypothetical employee meets only one of the elements in the standalone executive exemption. § 541.100. The standalone executive exemption mirrors the standalone administrative exemption: they both have conjunctive elements laying out an employee's duties. Compare *id.*, with § 541.200. While the elements are conjunctive in the standalone exemptions, they are disjunctive when paired with a high salary. § 541.601(c). Analogously, then, employees may be exempt as administrative HCEs even if they do not meet all the elements in the standalone administrative exemption. So an employee could be an administrative HCE if the employee customarily and regularly performed "office or non-manual work directly related to the management or general business operations of the employer," § 541.200(a)(2), even if the employee's duties did not "include[ ] the exercise of discretion and independent judgment with respect to matters of significance," § 541.200(a)(3).[47]

In *Zannikos v. Oil Inspections (U.S.A.), Inc.*,[48] the Fifth Circuit concluded that the plaintiffs did not fall within the administrative exemption because their primary duties did not include the exercise of "discretion and independent judgment" with respect to matters of significance. But the court concluded that the HCE exemption *did* apply because plaintiffs' primary duties included a component that met an element of the "administrative exemption."[49]

Section 541.201 of the FLSA regulations specifically defines the type of job duties which qualify as administrative:

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

---

[47] *Smith v. Ochsner Health System,* 956 F.3d 681, 685 (5th Cir. 2020).
[48] 605 F.App'x 349 (5th Cir. 2015).
[49] *Id.*

(b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.[50]

Schlumberger thus need only establish that an employee customarily and regularly performed one or more of these exempt duties or responsibilities and that their primary duties were non-manual in nature.[51] Schlumberger contends that the summary judgment record establishes that the job duties of the seven plaintiffs at issue satisfy these requirements as a matter of law.

### D.    Hani Anklis.

Schlumberger first argues that Hani Anklis falls within the HCE exemption based on the summary judgment record. Anklis began his employment with Schlumberger on July 12, 2005, as a MWD and transitioned to a DD in 2008.[52] He remained a DD through the end of his employment on July 12, 2015.[53] While working as a DD he received a base salary plus bonuses.[54] He received the same amount every two weeks whether he worked or not.[55] In addition, there were no

---

[50] 29 C.F.R. § 541.201.
[51] Id.
[52] ECF No. 540, Ex. 1, Anklis Deposition, at p. 17; Ex. 2, Marroquin Declaration, at ¶ 5 & attached exhibit 2- 1.
[53] Id.
[54] ECF No. 540, Ex. 1, Anklis Deposition, at 37. See also Declaration of M. F. van Vliet attached as Exhibit 3, at ¶ 5.
[55] Id.

deductions to his salary for any reason.[56] He also received bonuses including a day bonus or day rate.[57]

In 2012, Anklis' total compensation was $280,913.36.[58] His bi-weekly salary was $1,980.77, or $990.38 per week. In 2013, Anklis' total compensation was $292,221.02, which included a bi-weekly salary of $1,980.77, or $990.38 per week.[59] In 2014, Anklis' total compensation was $347,753.70, which included a bi-weekly salary $1,980.77, or $990.38 per week.[60] In 2015, Anklis received $98,791.49 total compensation (or approximately $169,357 pro rated annually) which included a bi-weekly salary of $1,485.58, or $742.79 weekly through his July 2015 termination date.[61]

When he worked as Lead DD, Anklis was ultimately responsible for the directional drilling work performed at the rig.[62] Anklis had very little contact with the DD coordinator in the office while he was at the well site.[63] Even though MWDs had their own manager, Anklis oversaw their work on the rig.[64] As Lead DD, Anklis trained or mentored as needed. This included teaching trainees on the job.[65] Lead DDs had the authority to replace other DDs if their performance lagged, and Anklis testified that there are many cases when that occurred.[66] Schlumberger's business managers would often ask Anklis his opinion about less experienced DDs.[67]

---

[56] Id.
[57] Id. at p. 37. See also Ex. 3, van Vliet Declaration, at ¶ 5.
[58] ECF No. 540, Ex. 1, Anklis Deposition; Ex. 2, Marroquin Declaration & attached exhibits 2-2 and 2-3.
[59] Id.
[60] Id.
[61] Id.
[62] Id. at 61. See also Ex. 3, van Vliet Declaration, at ¶¶ 16, 27; Ex. 4, Kuwertz Deposition, at p. 190, 272; Deposition of E. Monckton, attached as Exhibit 7, at pp. 29, 36, 165, 173; Deposition of M. F. van Vliet, Volume I, attached as Exhibit 6, at pp. 150, 154.
[63] ECF No. 540, Ex. 1, Anklis Deposition, at 128.
[64] Id. See also Ex. 4, Kuwertz Depo., at pp. 270-272.
[65] Id. at 62. See also Ex. 3, van Vliet Declaration, at ¶ 16; Ex. 4, Kuwertz Deposotopm, at p. 270, 281-283; Ex. 7, Monckton Depo., at pp. 65-66, 81; Ex. 5, van Vliet, Vol. II, at pp. 41-42.
[66] Id. at 66.
[67] Id. at 68. See also Ex. 3, van Vliet Declaration, at ¶ 16; Ex. 4, Kuwertz Deposition, at p. 287; Ex. 5, Monckton Deposition, at pp. 65-66, 68, 102, 165.

As Lead DD on site, Anklis was the lead interface with the company.[68] His communication duties included keeping the company up to date as to the progress of the well plan. The contact was regular, Anklis would raise any issues and help resolve the issues.[69]

Part of his job as DD was to provide instruction to the Driller as to how to "steer" the bottom of the well hole assembly and ensured that they hewed to the well plan; it was very rare for the Driller to reject Anklis' instructions.[70] Anklis, as the DD, essentially supervised the Driller.[71] As a DD, Anklis did not physically control the drill string when it was in the hole. For safety and insurance reasons, he was not allowed to touch the company's rig equipment.[72]

Anklis' duties during operation included checking that the tools were functioning properly down hole and verifying that the drill string was staying on path.[73] When Anklis saw that a correction needed to happen, he intervened and worked with the Driller on a solution to address the problem.[74]

Anklis' responsibilities included ensuring that they did not lose the entire drill string, which would have been a multi-million-dollar issue.[75] Anklis watched the MWDs provide their surveys and if the survey data indicated that the drill was veering off path, Anklis shut down the drilling operation and instructed the Driller on how to return the drill back onto the intended well path.[76] Determining the proper corrective action required Anklis to use both mathematical calculations

---

[68] ECF No. 540, Ex. 1, Anklis Deposition, at 80. See also, Ex. 3, van Vliet Declaration, at ¶ 16; Ex. 5, van Vliet Deposition, Vol. II, at p. 41.
[69] ECF No. 540, Ex. 1, Anklis Deposition, at 81.
[70] Id. at 85-86. See also Ex. 3, van Vliet Declaration, at ¶ 13; Ex. 4, Kuwertz Deposition, at 276- 279; Ex. 5, van Vliet Deposition, Vol II, at pp. 96, 98.
[71] Id. at 115. See also Ex. 3, van Vliet Declaration, at ¶¶ 11 – 13; Ex. 4, Kuwertz Deposition., at pp. 276-277.
[72] Id. at 84.
[73] Id. at 91. See also Ex. 3, van Vliet Declaration, at ¶¶ 12 - 13; Ex. 4, Kuwertz Deposition, at 276-279; Ex. 5, van Vliet Deposition, Vol II, at pp. 96, 98.
[74] Id. at 92.
[75] Id. at 96.
[76] Id. at 97. See also Ex. 3, van Vliet Declaration, at ¶ 13.

and his judgment.[77] While drilling was occurring, Anklis constantly observed the drilling operations and the relevant data and provided instructions to the Driller on how to steer the drill based on the trends Anklis observed in the data.[78]

Schlumberger argues that Anklis is exempt for the FLSA based upon the HCE exemption because his duties were non-manual, and he customarily and regularly performed at least one exempt duty or responsibility under the executive or administrative exemptions. His annual compensation also exceeded $100,000 per year, of which over $455 per week was paid on a salary basis. The Court agrees.

The duties of an exempt executive employee include managing a subdivision of the enterprise or supervising two or more employees. Anklis customarily and regularly performed both these duties. He was a senior DD serving as lead or cell manager from 2010 until his termination.[79] As a Lead DD, Anklis assigned tasks and monitored performance.[80] He trained and mentored the cell members.[81] All of these were ongoing responsibilities while Anklis served as Lead DD.[82] The summary judgment record thus establishes that Anklis regularly performed the duties outlined in 29 C.F.R. §§ 541.102 and 104. Plaintiffs have not come forward with evidence sufficient to create a genuine question of material fact as to these duties.

Anklis also satisfies the requirements of the HCE under the administrative exemption as he regularly performed "non-manual work directly related to the management or general business operations of the employer or the employer's customers."[83] The phrase "directly related to the

---

[77] *Id.* at 99-100. See also Ex. 3, van Vliet Declaration, at ¶ 13; Ex. 4, Kuwertz Deposition, at pp. 108, 206-208, 210, 214, 278-279.
[78] *Id.* at 106.
[79] ECF No. 540, Ex. 1; Anklis Deposition, at 18.
[80] *Id.*, at 61. See also Ex. 3, van Vliet Declaration, at ¶ 16; Ex. 4, Kuwertz Deposition, at pp. 270-272.
[81] *Id.*, at 62. See also Ex. 3, van Vliet Declaration, at ¶ 16; Ex. 5, van Vliet Deposition, Vol. II, at pp. 79-80; Ex. 7, Monckton Deposition, at pp. 65-66, 68, 102, 165; Ex. 4 Kuwertz Deposition, at pp. 281-283.
[82] *Id.*, at 61, 62, 66.
[83] 29 C.F.R. § 541.200(a)(2).

14

management or business operations" refers to the type of work performed by the employee.[84] Administratively exempt employees are those "whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."[85] The regulations specifically identify quality control and safety as administrative duties qualifying for the exemption.[86] Further, an employee who serves as an advisor and consultant to an employer's customers will also qualify for the exemption.[87] The summary judgment record shows that Anklis customarily and regularly performed as an advisor and consultant to Schlumberger's customers.[88] Anklis affected the customer's business operations to a substantial degree. As stated above, he directed and supervised the rig crew through the directional drilling operation, giving continuous input to the Driller as to the steps necessary to stay on the drill plan. His guidance was crucial to the success of the drilling operation.[89] Anklis also continuously performed a significant quality control function. Specifically, Anklis would inspect the surveys performed by the MWD and, if they appeared off to him, he would direct the MWDs to "reshoot" the survey.[90] If the monitors indicated that the drill was straying from the well path, Anklis instructed the Driller on what actions to take to adjust the drill.[91] Anklis also had significant safety responsibilities, which are administrative duties.[92] While the rig crew was performing work under Anklis' supervision, he was ensuring safety.[93] Further, Anklis' supervision

[84] 29 C.F.R. § 541.201(a).
[85] 29 C.F.R. §§ 541.201(a), 541.205(a).
[86] 29 C.F.R. § 541.201(b).
[87] 29 C.F.R. § 541.201(c).
[88] *See* generally Ex. 3, van Vliet Declaration, at ¶¶ 9, 13; Ex. 5, van Vliet Deposition, Vol. II, at pp. 7-8, 25; Ex. 6, van Vliet Deposition, Vol. I, at p. 150; Ex. 4 Kuwertz Deposition, at pp. 49, 111, 128, 216, 278-279, 306.
[89] ECF No. 540, Ex. 5, van Vliet Deposition, Vol. II, at 77-78.
[90] ECF No. 540, Ex. 1, Anklis Deposition, at 97.
[91] *Id.*
[92] *See* 29 C.F.R §541.201(a).
[93] ECF No. 540, Ex. 1 at 109; Ex. 5, van Vliet Deposition, Vol. II, at 121; Ex. 4, Kuwertz Deposition, at 123, 125, 273, 275.

of the rig crew during the directional drilling operation was another administrative function he performed as part of his duties.[94]

In sum, based on the summary judgment record, the Court concludes that Anklis' duties as a DD were non-manual in nature. To qualify for the HCE exemption, the employee's primary duty must include performing office or non-manual labor.[95] Anklis was not allowed to perform manual work on the rig for safety and insurance reasons.[96] Anklis' primary duties involved monitoring data and providing direction and advice. Monitoring data and providing direction or advice is not manual labor. The limited manual labor that Anklis performed, does not alter this conclusion. The mere fact that an exempt employee performs some manual work does not convert that employee to a non-exempt laborer.[97] Plaintiffs have not come forward with evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. Accordingly, the HCE exemption applies to Anklis as a matter of law. The Court, therefore, GRANTS Schlumberger's motion for summary judgment with respect to Anklis.

### E.    Michael Ainsworth.

Michael Ainsworth began employment as a DD for PathFinder in August 2007 and PathFinder was acquired by Schlumberger in August of 2010.[98] Ainsworth voluntarily ended his employment with STC with an effective date in January 2014.[99] Throughout his employment with STC, Ainsworth was paid on a salary basis.[100] He received that same salary regardless of the number of days or hours he worked.[101] In addition, he received bonuses, often referred to as day

---

[94] *See Zannikos v. Oil Inspections (U.S.A.) Inc.,* No. 12-2508, 2014 WL 12771511 at *5 (S.D. Tex. Jan 30, 2014) (finding that the inspector's supervision of the customer's line blending operation was an administrative task).
[95] 29 C.F.R. § 541.601.
[96] ECF No. 540, Ex. 1, Anklis Deposition, at 84.
[97] *Smith v. Ochsner Health System,* 956 F.3d 681 (5th Cir. 2020).
[98] ECF No. 541, Exhibit 1, Ainsworth Deposition, at pp. 17-19.
[99] *Id.*
[100] ECF No. 541, Exhibit 2, Marroquin Declaration at ¶ 6 & attached exhibit 2-1.
[101] ECF No. 541, Exhibit 1, Ainsworth Deposition, at p. 32.

rates, which varied based on factors such as crew size or technology used, for each day that he worked at a well site.[102] From 2011 to 2013, Ainsworth was paid a bi-weekly salary of $1,846.15, or $923.07 per week.[103] His total earnings for 2011, 2012, and 2013 were $215,315.30, $225,653.41, and $233,330.05, respectively.[104]

As a DD, Ainsworth's job was to give instructions to the Driller—the member of the rig crew who operated the controls for the drill string—as to how to drill the well.[105] He instructed the Driller on "sliding", "weighting the bit", and "drilling the curve."[106] Schlumberger prohibited DDs from operating the customer's equipment.[107]  Further, drilling rig companies often refused to let Ainsworth or other DDs run their equipment as a matter of policy.[108]  Ainsworth was not responsible for any maintenance on the directional drilling equipment.[109]

As a DD, Ainsworth was provided with "a well plan,"[110] which contains the target trajectory for the path of the well through the formations and to the production zone.[111] The well plan provides a "kick-off" point from which it was Ainsworth's responsibility to build the curve through to the end of that curve or landing point.[112] As Ainsworth stated, it was his responsibility to direct the Driller in the building of the curve to get the well from point A to point B.[113]

---

[102] *Id.*, at pp. 32-33. *See also* Exhibit 3, Declaration of M. F. van Vliet, at ¶ 5.
[103] *Id.*, at attached Ex. 7. *See also* Exhibit 2, Marroquin Declaration, at ¶ 6 & attached Exhibit 2-1.
[104] *Id.*, at pp. 35-38; Ex. 2, Marroquin Declaration, at ¶¶ 7 – 9 & attached Ex. 2-2 through 2-7.
[105] *Id.*, at pp. 60-61. *See also* Exhibit 4, Kuwertz Deposition, at pp. 40-41, 207-209, 214, 220, 278-279; Exhibit 5, van Vliet Deposition, Vol. II, at pp. 6-8; 91-92, 95-96; Ex. 2, van Vliet Declaration at ¶ 13.
[106] *Id.*, at pp. 60- 61. *See also* Exhibit 3, Kuwertz Deposition, at pp. 208-209, 275, 278-279; Exhibit 6, van Vliet Deposition, Vol., at p. 150.
[107] *Id.*, at pp. 59-60.
[108] *Id.*, at p. 58.
[109] *Id.*, at p. 73.
[110] *Id.*, at p. 74.
[111] *Id.*, at p. 68. See also Exhibit 4, Kuwertz Deposition, at p. 108; Exhibit 5, van Vliet Deposition, Vol. II, at pp. 7, 97.
[112] *Id.*, at pp. 74-75. See also Exhibit 4, Kuwertz Deposition, at pp. 207-208.
[113] *Id.*

Ainsworth also directed the pointing of the "mud motor" within the target zone to keep the bottom hole assembly ("BHA")—which is the base of the "drill string" where the drill bits, motors, and sensor packages are located—within that zone.[114] If the BHA's trajectory trended outside the target the zone, Ainsworth instructed the Driller on how to correct it, such as by changing the BHA's trajectory up, down, side to side, or whichever direction was required to keep the BHA within the target zone.[115] Ainsworth did not use a checklist or a standard operating procedure that dictated a solution; he decided what instructions to give the Driller based on his experience.[116] When the rig was drilling, Ainsworth was typically located on the floor with the Driller; when he was not on the rig floor with the Driller, he continued to monitor the drilling parameters and data from a screen or terminal to monitor the status of drilling operations.[117] Ainsworth was constantly monitoring for potential problems.[118]

When Ainsworth first arrived at a rig, he took an inventory and made sure all the required items were there and set up his computer.[119] He consulted with the company representative to ensure that there were no changes to the drilling plan.[120] When they were ready, the drilling crew picked up the tools that make up the BHA.[121] Ainsworth gave the driller a diagram or a list of the components of the BHA that the crew was going to assemble, and instructed the crew on the amount of torque to be applied to join the pieces.[122] Ainsworth showed the rig crew what he wanted them to do, and the rig crew used their methods to move the items onto the rig floor.[123] The rig

---

[114] *Id.*, at p. 69. *See also* Exhibit 4, Kuwertz Deposition, at pp. 40-41, 207-209, 214, 220, 278-279; Exhibit. 5, van Vliet Deposition, Vol. II, at pp. 6-8; 91-92, 95-96.
[115] *Id.*, at p. 69.
[116] *Id.*, at p. 69. *See also* Exhibit 4, Kuwertz Deposition, at p. 215.
[117] *Id.*, at pp. 71-72.
[118] *Id.*, at p. 72.
[119] *Id.*, at pp. 61-62. *See also* Exhibit 4, Kuwertz Deposition, at p. 123; Exhibit 3, van Vliet Declaration, at ¶ 15.
[120] *Id.*
[121] *Id.*, at p. 62.
[122] *Id.*
[123] *Id.*, at pp. 64-65.

crew operated the derrick and hoist for picking up the tools.[124] Ainsworth ensured that the rig crew picked up the tools correctly.[125] Ainsworth did not use his own hands to work with the tools; he only monitored the work of the roughnecks on the site.[126]

Ainsworth also inspected the surveys performed by MWDs and, if they appeared incorrect, he directed the MWDs to "reshoot" the survey.[127] Sometimes, when he was "building the curve," Ainsworth would receive a survey that showed that he was not attaining the build rates that he was expecting.[128] In those situations, depending on the formation within which the BHA was drilling, Ainsworth had the rig reduce the flow rate, slow drilling to hold a more accurate tool face, or pull out of the hole to get a different tool.[129] Ainsworth relied on his experience for these decisions, and most of the time he did not have to get permission from the company representative to make these changes.[130] If there were problems with the directional drilling equipment, the DD would trouble shoot the problem, consult with the company representative, and provide his opinion as to what was causing the problem.[131]

Schlumberger contends that Ainsworth's duties were non-manual and that he customarily and regularly performed at least one exempt duty or responsibility under the administrative exemption and that the HCE exemption applies as a matter of law. The Court agrees. Ainsworth's annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis. Ainsworth performed many of the same duties as Anklis, and customarily and regularly acted as an advisor and consultant to Schlumberger's customers. Ainsworth was

---

[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.*, at pp. 84-85.
[128] *Id.*, at pp. 79-80.
[129] *Id.*
[130] *Id.*, at 79-80. *See also* Exhibit 4, Kuwertz Deposition, at pp. 206-208, 278-279.
[131] *Id.*, at 78-79. *See also* Exhibit 3, van Vliet Declaration, at ¶ 14.

responsible for instructing Drillers—members of the rig crew who operated the controls for the drill string—on how to drill the well.[132] He instructed the Driller on sliding, weighting the bit, and drilling the curve.[133] Ainsworth spent most of his time directing the Drillers.[134] Ainsworth also continuously performed a significant quality control function. Ainsworth would inspect the surveys performed by the MWD and, if they appeared off to him, he would direct the MWDs to "reshoot" the survey.[135] Ainsworth also had significant safety responsibilities, which are administrative duties.[136]

In sum, the summary judgment record establishes that Ainsworth customarily and regularly performed multiple administratively exempt duties. Only one such exempt duty is required to trigger the HCE exemption. Moreover, like Anklis, the summary judgment record establishes that Ainsworth's duties as DD were primarily non-manual in nature. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. Accordingly, the HCE exemption applies to Ainsworth as a matter of law and Schlumberger's motion for summary judgment is GRANTED with respect to Ainsworth.

### F.     Gadi Ogbogu.

Schlumberger next moves for summary judgment with respect to Gadi Ogbogu. Ogbogu began his employment with STC on July 25, 2006.[137] He worked in the field, as a MWD from 2006 through 2009.[138] Beginning on July 1, 2009, Ogbogu was assigned to and worked as a

---

[132] *Id.*, at 60-61. *See also* Exhibit 4, Kuwertz Deposition, at pp. 40-41, 207-209, 214, 220, 278-279; Exhibit 5, van Vliet Depo., Vol. II, at pp. 6-8; 91-92, 95-96; Exhibit 3, van Vliet Declaration., at ¶¶ 9-13.
[133] *Id.*, at pp. 60-61. *See also* Exhibit 4, Kuwertz Deposition, at pp. 208-209, 275, 278-279; Exhibit 6, van Vliet Deposition, Vol. I, at p. 150.
[134] *Id.*
[135] *Id.*, at pp. 84-85.
[136] *See* 29 C.F.R §541.201(a).
[137] ECF No. 542, Exhibit 1, Ogbogu Deposition, at pp. 17-18.
[138] *Id.*, at pp. 17-18

member of STC's Operations Support Center (the "OSC").[139] While working in the OSC, Ogbogu provided support to MWDs in the field.[140] Ogbogu's time working in the OSC ended on or about November 3, 2013.[141] Ogbogu left the OSC in November 2013 and transitioned to working in the field providing DD services for the first time.[142] He continued to perform these services until March 2015, when he was laid off as part of a reduction in force.[143] Ogbogu was paid on a salary basis.[144] He received that same bi-weekly salary regardless of how much he worked—even if he did not work an entire week.[145]

When Ogbogu worked in the OSC, his annual salary was $68,300 per year, or $1,311.58 per week.[146] When he returned to field work as a DD, his annual salary remained at the same level.[147] He remained at that salary level until shortly before his termination in March 2015, when his salary was reduced to $57,096 annually, or $1,115.31 per week.[148] In 2012, 2013 and 2014, his total compensation was $216,948.24, 200,853.00, and $202,066.08 respectively.[149] His total compensation through March of 2015 was $55,554.50.[150]

Ogbogu testified that when he went to work in the field as a DD, he immediately "took the reins."[151] He worked on rigs owned by Schlumberger's clients whose business involved creating wells that would produce oil and gas.[152] As a DD, he was not physically controlling the BHA.[153]

---

[139] Id.
[140] Id., at pp. 49-50.
[141] Id., at p. 18.
[142] Id., at pp. 18-19.
[143] Id.
[144] Id., at 35.
[145] Id.
[146] ECF No. 542, Exhibit 2, Marroquin Declaration, at ¶ 5 & attached ex. 2-1.
[147] Id.
[148] Id.
[149] Id.
[150] Id.
[151] ECF No. 542, Exhibit 1, Ogbogu Deposition, at p. 57
[152] Id., at 73-78.
[153] Id., at 73-74.

Controlling the BHA was the job of the Driller.[154] Ogbogu's job was to provide instruction to the Driller on how to orient and steer the BHA to stay in the well plan.[155] The Driller followed his instructions.[156] Ogbogu never actually operated the controls.[157]

Before arriving at the rig, Ogbogu would participate in a meeting between Schlumberger and the customer.[158] Once he arrived at the rig site, he would check in with the company representative.[159] He would then inventory his equipment since part of his job was managing the inventory and ordering needed items.[160] Next, he prepared for the crew to "pick up" the BHA.[161]

The rig crew physically assembled all the components of the BHA.[162] While the rig crew assembled the BHA, Ogbogu monitored different gauges to make sure the rig crew performed this job in a safe manner.[163] Before the drilling would commence, Ogbogu would the shallow hole test to ensure the equipment was running properly.[164] Once the drilling began, Ogbogu monitored the drilling parameters, rate of penetration, flow rates, inclination, and azimuth.[165] As a DD, Ogbogu monitored various drilling parameters in real time, and, as drilling conditions changed, he would instruct the driller to adjust the drilling parameters.[166] Ogbogu used his experience, the real time performance of the BHA, and past results of the well (or trends) to decide how to slide to stay within the parameters.[167]

---

[154] *Id.*
[155] *Id.*, at pp. 73-75. See also Exhibit 3, van Vliet Declaration, at ¶ 13; Exhibit 4, Kuwertz Deposition, at pp. 207-208.
[156] *Id.*
[157] *Id.*
[158] *Id.*, at pp. 78-79.
[159] *Id.*
[160] *Id.*
[161] *Id.*
[162] *Id.* at p. 76.
[163] *Id.*
[164] *Id.*
[165] *Id.*, at pp. 80-85.
[166] *Id.*
[167] *Id.*, at pp. 93-95.

As the DD, Ogbogu received surveys from the MWD that pinpointed the BHA's location underground, and Ogbogu used those surveys to make steering adjustments and decisions.[168] If the data that the MWD provided differed significantly from the expected data, he would instruct the MWD to conduct another survey.[169] Ogbogu predicted which way the BHA would move by using information regarding the formation, the zone, the hole, and the motor.[170] There is no standard operating procedure or checklist to follow regarding corrective action to get back on a well path.[171] It was his responsibility to make sure that they were attaining the required curve.[172]

Schlumberger argues that Ogbogu falls under the HCE exemption because his duties were not manual, and he customarily and regularly performed at least one exempt duty or responsibility under the administrative exemption. His annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis.

As with Anklis and Ainsworth, the Court agrees that the summary judgment record establishes that Ogbogu falls within the HCE exemption. To trigger this exemption, Schlumberger need only establish that Ogbogu customarily and regularly performed one or more of these exempt duties or responsibilities. Here, Ogbogu's duties were similar to both Anklis and Ainsworth. His primary duties involved acting as an advisor and consultant to Schlumberger's customers. He never operated the equipment but rather directed others how to do so and monitored their actions. He provided quality control by inspecting surveys taken by MWDs and instructing Drillers on what adjustments to make. He performed safety responsibilities by ensuring that the rig crew carried out their tasks safely. Ogbogu's supervision of the rig crew during the drilling operation

---

[168] *Id.*
[169] *Id.*
[170] *Id.*, at pp. 80-85.
[171] *Id.*, at pp. 93-95.
[172] *Id.*

was yet another administrative function. Ogbogu's duties as DD were also primarily non-manual in nature.

In sum, the summary judgment record establishes that Ogbogu customarily and regularly performed multiple administratively exempt duties. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. Accordingly, the HCE exemption applies to Ogbogu as a matter of law. The Court GRANTS Schlumberger's motion for summary judgment with respect to Ogbogu.

### G.  Thomas Naron.

Schlumberger's motion next addresses the claims of Thomas Naron. The summary judgment record shows that Naron began his employment with Anadrill as a MWD and was later employed by Schlumberger when Schlumberger acquired Anadrill.[173] Naron became one of the first STC employees designated as a "DDX", meaning that he was cross trained to provide both DD and MWD services.[174] As a DDX, Naron performed DD services more often than MWD services.[175] After injuring his back in 2007 and again in 2011, Naron could no longer climb stairs and, in 2012, he was transferred to the Operational Support Center ("OSC") where he remained until his termination in April 2015.[176]

Throughout the relevant period, Naron was paid a salary on a bi-weekly basis.[177] Naron understood that he was paid on a salary basis, that he would receive the same salary no matter how many hours he worked, and that there were no deductions other than required or authorized

---

[173] ECF No. 543, Exhibit 1, Naron Deposition, at pp. 17-18.
[174] *Id.*
[175] *Id.*, at p. 20.
[176] *Id.*, at p. 27.
[177] *Id.* at pp. 39-40. *See also* Exhibit 2, van Vliet Declaration, at ¶ 5.

deductions such as taxes.[178] Additionally, Naron received bonuses that were paid the same as a DD working on a well site.[179] In 2012 through August 2014, Naron was paid a bi-weekly salary of $2,057.69, or $1,028.84 weekly.[180] Naron's bi-weekly salary increased to $2,151.92, or $1,075.96 weekly, at that time.[181] Naron's total compensation for 2012, 2013, 2014, and 2015 was $255,649.74, $265,200.26, $252,593.86, and $126,148.82, respectively.[182] Further, Naron recalls making over $100,000 dollars in each year that he worked, including his last year.[183]

The OSC supported DDs who were working on Schlumberger's customers' well sites.[184] Naron's job as a DDX working in the OSC was different from the duties of DDs in the field.[185] There was no manual work in the OSC.[186] In fact, the reason Naron began working in the OSC was that, because of his injuries, he could no longer climb stairs.[187] His work at the OSC pertained solely to directional drilling.[188]

The summary judgment reflects that all of the DDs working in the OSC, including Naron, were classified at the highest grade held by field employees.[189] Naron personally monitored up to 40 ongoing directional drilling operations at a time.[190] The role of DDs in the OSC was to assist the field services managers by assisting DDs located at a wellsite and having the OSC DDs monitor, intervene, and provide their expertise to the wellsite DDs to resolve issues.[191] While in the OSC, Naron's duties required consistent monitoring of the actual performance of the 30 to 40

---

[178] *Id.*
[179] *Id.*
[180] ECF No. 543, Exhibit 3, Marroquin Declaration, at ¶¶ 5 – 8 & attached exhibits 3-2, 3-4, 3-6, and 3-7.
[181] *Id.*
[182] *Id.*
[183] ECF No. 543, Exhibit 1, Naron Deposition, at pp. 41-42.
[184] ECF No. 543, Exhibit 2, van Vliet Declaration, at ¶ 18.
[185] ECF No. 543, Exhibit 1, Naron Deposition, at p. 75
[186] *Id.*, at p. 76.
[187] *Id.*
[188] *Id.*, at p. 33.
[189] *Id.*, at p. 72.
[190] *Id.*, at pp. 48, 75-76.
[191] *Id.*, at pp. 61-62.

wells versus well plan projections.[192] Naron's monitoring the well plan was based on his analysis of surveys provided by the MWDs.[193] When Naron observed that a DD at a rig was deviating from the well plan, he contacted the DD at the rig to discuss the issue with him and attempt to help correct the problem.[194]

Naron also continuously performed anti-collision monitoring for the wells for which he was assigned.[195] The summary judgment record reflects that Naron could be responsible for as many as six wells in close proximity at any one time.[196] In addition, Naron's responsibilities included serving as a "help desk" for DDs on the rig sites[197] —serving as a resource was a key duty his position in the OSC.[198] Naron's duties also included record keeping with respect to reporting incidents on the well site.[199]

Schlumberger contends that Naron's duties were non-manual and that he customarily and regularly performed at least one exempt duty or responsibility under the administrative exemption. The Court agrees. Naron's annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis. Again, Schlumberger need only show that Naron customarily and regularly performed one or more of these exempt duties or responsibilities.

Specifically, the record shows that Naron customarily and regularly performed as an advisor and consultant to Schlumberger's DDs. He provided technical advice and alerted them to problems;[200]these job functions affected and implemented his employer's operating practices.[201]

---

[192] *Id.*, at p. 66.
[193] *Id.*, at p. 66.
[194] *Id.*, at pp. 49-52.
[195] *Id.*, at p. 73.
[196] *Id.*, at p. 56.
[197] *Id.*, at p. 73.
[198] *Id.*
[199] *Id.*
[200] *Id.*, at p. 77.
[201] *See* 29 C.F.R. § 202(b).

Naron also continuously performed quality control functions by monitoring the progress of drilling operations.[202] Naron was also responsible for monitoring for "anti-collision," which is an important safety responsibility; safety responsibilities qualify as administrative duties.[203]

Considering the summary judgment record, Schlumberger has established that the HCE exemption applies to Naron. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. The Court therefore GRANTS Schlumberger's motion for summary judgment with respect to Naron.

### H.    Brian Dankowski.

Schlumberger next moves for summary judgment with respect to Brian Dankowski. The summary judgment record reflects that Dankowski began his employment with Schlumberger in February 2007, as a field engineer trainee in MWD.[204] Dankowski transitioned to a DD Engineer position in November 2011 and performed mostly DD work until January 2015.[205] After that, Dankowski transitioned to a DDX and worked with a remote MWD Specialist located at the Remote Operations Center ("ROC").[206] Dankowski was terminated as part of reduction of force in February 2016.[207]

Dankowski was paid on a salary basis as a DD.[208] He received the same salary regardless of the number of hours he worked and even received compensation during weeks when he performed no work.[209] Additionally, Dankowski received bonuses for days spent on the rig or

---

[202] ECF No. 543, Exhibit 1, Naron Deposition, at pp. 52, 73.
[203] *Id.*, at p. 55.
[204] ECF No. 544, Exhibit 1, Dankowski Deposition, at p. 13.
[205] *Id.*, at pp. 16-17.
[206] *Id.*, at pp. 48-51.
[207] *Id.*, at p. 19.
[208] *Id.*, at pp. 31-32. *See also* Exhibit 3, van Vliet Declaration, at ¶ 5; Exhibit 4, van Vliet Deposition, Vol. II, at p. 132.
[209] *Id.*, at pp. 31-32.

performing other types of work.[210] In 2012, 2013, 2014 and 2015, Dankowski received total compensation of $199,012.39, $229,971.32, $186,400.92, and $163,233.47 respectively.[211] His weekly salary for each of those years were $1,426.92, $1,486.76, $1,529.81, and $1,529.81 respectively.[212] For the first two months of 2016, prior to his termination, Dankowski's total compensation was $62,492.39 and his weekly salary remained at $1,529.81.[213]

When Dankowski worked in the field there were typically two DDs on site.[214] One DD and the MWD would cover the day shift while the others worked the night shift.[215] During his last two years of employment, Dankowski worked as a DDX with a reduced crew and would serve as the night DD and MWD.[216] Usually, he was supported by an MWD located at the ROC.[217] If the communications between the rig and the ROC failed, Dankowski performed both jobs.[218]

As a DD, Dankowski was responsible for the execution phase of the directional drilling job at the rig.[219] Dankowski was responsible for "anti-collision" monitoring and "steering" the well properly.[220] He was also responsible for communicating with the office about changes to the well plan and corrections that may be needed.[221] Dankowski participated in calls or meetings prior to beginning a project; in those meetings, the rig workers and supervisors discussed the "well plan."[222]

---

[210] *Id.*, at pp. 32-33.
[211] *Id.*, at pp. 33-35; Exhibit 2, Marroquin Declaration, at ¶ 7 & attached exhibits 2-3 and 2-4.
[212] *Id.*
[213] *Id.*
[214] *Id.*, at p. 47. *See also* Exhibit 3, van Vliet Declaration, at ¶ 8; Exhibit 4, van Vliet Depo., Vol. II, at p. at 41.
[215] *Id.*, at pp. 46-48.
[216] *Id.*, at pp. 49-51.
[217] *Id.*, at pp. 49-50.)
[218] *Id.*, at p. 50.
[219] *Id.*, at pp. 53, 55. *See also* Exhibit 3, van Vliet Declaration, at ¶ 9; Exhibit 5, Kuwertz Deposition, at pp. 207-208; Exhibit 6, van Vliet Deposition, Vol. I, at p. 150.
[220] *Id.*, at pp. 53, 55. *See also* Exhibit 3, van Vliet Declaration, at ¶ 13; Exhibit 5, Kuwertz Deposition, at pp. 40-41, 207-209, 214, 220, 278-279; Exhibit 4, van Vliet Deposition, Vol. II, at pp. 6-8; 91-92, 95-96.
[221] *Id.*, at p. 56.
[222] *Id.*, at pp. 97-98.

As a DD, Dankowski did not actually assemble the BHA; rather, the rig crew is responsible for assembly.[223] Dankowski would check the cord and make sure that the threads are properly lubricated, and he also ensured that the rig crew was handling and assembling the tools properly.[224] While DDs are responsible for steering the well, they are not physically in charge of the controls.[225] Most of the time DDs are not allowed to touch the controls.[226] The DDs advise the Driller on what to do and how to adjust to stay on plan based on their evaluation of surveys received from the MWD.[227] As a DD, Dankowski determined where the BHA was in relation to the well plan and instructed the Driller on issues such as flow rates and drilling direction.[228]

As a DD, Dankowski assisted clients by providing solutions for drilling issues.[229] He advised the client throughout the drilling process and had discretion to deviate from the well plan, based on his drilling experience.[230] As a DD, Dankowski monitored any deviations from the well plan and decided when corrective action was needed.[231]

Schlumberger argues that Dankowski is exempt from the FLSA based upon the HCE exemption. According to Schlumberger, his duties were non-manual and he customarily and regularly performed at least one exempt duty or responsibility under the administrative exemption. The Court agrees. Dankowski's annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis. The summary judgment record establishes that Dankowski customarily and regularly performed one or more exempt duties or responsibilities.

---

[223] Id., at pp. 89-91; See also, Exhibit 5, Kuwertz Deposition, at 123-125, 273, 275.
[224] Id., at pp. 89-91.
[225] Id., at pp. 55, 99-101.
[226] Id.
[227] Id., at pp. 101-104, 121-123.
[228] Id.
[229] Id., at pp. 69, 73, 107, 110-111.
[230] Id., at pp. 107, 113-115.
[231] Id., at p. 112.

Specifically, Dankowski customarily and regularly performed as an advisor and consultant to Schlumberger's customers.[232] Dankowski instructed the Driller; the Driller is a member of the rig crew who operates the controls for the drill string, as well as the process of drilling the well.[233] He instructed them on "sliding," "weighting the bit," and "drilling the curve."[234] Dankowski thus directed and supervised the rig crew throughout the directional drilling operation, and provided input to the Driller as to the steps necessary to maintain the drilling plan. He also performed significant quality control functions by guiding the Driller in line with the well plan and continually reviewing surveys provided by the MWD, determining the BHA location and deciding on remedial course corrections. Further, Dankowski had safety responsibilities as he was responsible for "anti-collision" monitoring. All these duties qualify as administrative duties. Dankowski's supervision of the rig crew during the directional drilling operation was yet another administrative function.

Considering the summary judgment record, Schlumberger has established that the HCE exemption applies to Dankowski. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. The Court therefore GRANTS Schlumberger's motion for summary judgment with respect to Dankowski.

**I.      Joshua Eaton.**

Schlumberger next moves for summary judgment with respect to the claims of Joshua Eaton and asserts that the HCE exemption applies to Eaton. The summary judgment record shows that Eaton was hired by Schlumberger in May 2009.[235] He was promoted to a DD on February 26,

---

[232] *Id.*, at pp. 56-57, 69, 73, 78-81, 107, 110-111.
[233] *Id.*, at p. 101.
[234] *Id.*, at pp. 114-17.
[235] ECF No. 545, Exhibit 1, Eaton Deposition, at p. 11.

2012, with an annual salary of $62,004.[236] On July 27, 2014, he was promoted from DD to Drilling Engineer.[237] Eaton's employment with Schlumberger ended on or about May 2, 2015.[238] Eaton's total compensation for 2012, 2013 and 2014 was $213,713.78, $172,949.02, and $144,268.37 respectively.[239] His weekly salary for those years was $1,192.38.[240]

Eaton worked as a Lead DD or cell manager except for a short period of time immediately after his promotion.[241] The standard cell for the directional drilling team is four members consisting of two MWD's and two DDs. As the cell manager, Eaton was the focal point for ensuring the quality of the services being provided to Schlumberger's client and was the point of contact between the client and cell and between the client and Schlumberger's office personnel.[242]

As the cell manager, Eaton was responsible for the execution of the directional drilling services provided to Schlumberger's client.[243] Eaton testified that, as cell manager he was responsible for "ensur[ing] plans are executed properly at the wellsite."[244] The other DD on the wellsite report to the cell manager.[245] The cell manager provides on-the-job training and mentoring to cell members.[246] He also worked with trainees.[247] If asked, he provided his opinion on a trainee's performance.[248]

Eaton described himself "as the manager of a team of [four]."[249] He supervised the drilling team on logistics, equipment, troubleshooting, placement of equipment, quality of measured data

---

[236] ECF No. 545, Exhibit 2, Marroquin Declaration, at ¶ 5 & attached ex. 2-1.
[237] Id.
[238] Id.
[239] Id., at ¶ 7 & attached exhibits. 2-3 and 2-4.
[240] Id.
[241] ECF No. 545, Exhibit 1, Eaton Deposition, at pp. 59-62.
[242] Id., at pp. 62.
[243] Id., at p. 71
[244] Id.
[245] Id., at pp. 46-47.
[246] Id., at pp. 73-76
[247] Id., at p. 74
[248] Id., at p. 76
[249] Id., at attached exhibit 11 (LinkedIn profile of Joshua Eaton).

and mandatory tasks.[250] He was responsible for hitting client targets and maintaining well stability.[251] He trained individuals on company policy, quality health safety and the environmental reporting software, technical assessment, and drilling techniques.[252] Eaton also managed contracts with the client, updated billing daily, and delivered signed contracts and bills.[253]

As both a Lead DD and night DD, Eaton was responsible for "steering" the well consistent with the well plan, and he oversaw that process.[254] He also provided technical support to the client[255] and, when problems with drilling operations arose, his duties included consulting with clients on solutions.[256] His primary duty during the "execution phase" of the well is to steer the BHA to create a well path within limits set by the well plan.[257] The DD would use the MWD data to determine the location of the BHA and then decide if survey data was within acceptable limits.[258] Eaton, however, did not operate the rig controls, and in fact, he was not permitted to touch the rig controls.[259] Instead, Eaton conveyed to the Driller, who was actually drilling the well, the instructions on how to steer the BHA to keep the wellbore as close to the well plan as possible.[260] Eaton indicated that his instructions to the Driller were necessary because "[s]ome drillers can't slide" and the Drillers "don't know the math behind what [he] [did.]"[261]

Schlumberger contends that Eaton's job duties satisfy the "job duties" requirements for the HCE exemption and that the exemption applies as a matter of law. The Court agrees. The summary

---

[250] *Id.*
[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] *Id.*, at p. 46
[255] *Id.*, at pp. 45-46.
[256] *Id.*, at p. 54.
[257] *Id.*, at pp. 89-90.
[258] *Id.*, at p. 112.
[259] *Id.*, at pp. 102-103.
[260] *Id.*
[261] *Id.*

judgment record reflects that Eaton's annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis. To satisfy the "job duties" requirement of the HCE requirement, Schlumberger need only establish that Eaton customarily and regularly performed one or more of these exempt duties or responsibilities. The summary judgment record establishes that Eaton customarily and regularly performed one or more responsibilities of both an executive and administrative employee. His duties were not manual, and he customarily and regularly performed at least one exempt duty or responsibility under the executive or administrative exemptions.

The duties of an exempt executive employee include managing a subdivision of the enterprise or supervising two or more employees. Eaton customarily and regularly performed both duties. He was a senior DD serving as lead or cell manager from 2012 until his termination.[262] The Lead DD manages the cell and is responsible for the cell.[263] He trains and mentors the cell members and provides feedback with respect to the performance of his cell members that is afforded significant weight.[264] These are ongoing responsibilities while the DD is serving as Lead. Accordingly, Eaton regularly performs the executive duties outlined in 29 C.F.R. §§ 541.102 and 541.104.

Eaton also meets the requirements of the HCE under the administrative exemption as he regularly performed "non-manual work directly related to the management or general business operations of the employer or the employer's customers."[265] Eaton's primary duty was to manage the … drilling measurement services on the job site.[266] While at the wellsite, Eaton customarily

---

[262] *Id.*, at pp. 59-62.
[263] *Id.*
[264] *Id.*, at pp. 73-74
[265] 29 C.F.R. § 541.200(a)(2).
[266] ECF No. 545, Exhibit 6, van Vliet Deposition Vol. I, at p. 150

and regularly served as an advisor and consultant to Schlumberger's clients with respect to the directional drilling aspect of its business operations.[267] Eaton's primary job was to provide instruction to the Driller on how to steer the BHA to create a well path within the limits set by the well plan.[268] To do so, Eaton used survey data, compared it to the well plan, and determined if any adjustments needed to be made.[269] Reviewing the job description for the DD position, Eaton stated that his job involved "us[ing] logic to solve problems with effective solutions."[270] Eaton would then communicate these adjustments to the Driller who executed them.[271] Eaton's actions thus affected and implemented the customer's operating practices.[272]

Eaton also continuously performed a significant quality control function. Eaton would use the surveys performed by the MWD to determine where the BHA was positioned and whether the survey data was within acceptable limits. If the data was not within these limits, he would take remedial steps.[273] Further, Eaton's supervision of the rig crew during the directional drilling operation was another administrative function.

Considering the summary judgment record, Schlumberger has established that the HCE exemption applies to Eaton. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. The Court therefore GRANTS Schlumberger's motion for summary judgment with respect to Eaton.

---

[267] *Id.*
[268] ECF No. 545, Exhibit 1, Eaton Deposition, at pp. 89-90, 102-103.
[269] *Id.*, at pp. 90, 112.
[270] *Id.*, at pp. 53-54 and attached exhibit 7.
[271] *Id.*, at pp. 102-103.
[272] *See* 29 C.F.R. § 541.202(b).
[273] *Id.*, at p. 112.

### J.    James Davis.

Finally, Schlumberger contends that plaintiff James Davis falls within the HCE exemption. The summary judgment record shows that he began employment with Schlumberger as a DD on December 28, 2009.[274] Throughout a majority of his employment with Schlumberger and between January 2011 and his termination in January 2015, Davis was paid on a salary basis in the amount of $42,000 per year, or $807.69 per week.[275] He received the same salary every week and it did not change based upon the number of hours he worked in a week, and he received the salary even during weeks when he did not work.[276] He also received additional compensation that included such items as a rig bonus, commonly called a "day rate."[277] Davis' total annual compensation in 2012, 2013, and 2014 was approximately $187,926.60, $192,784.88, and $193,889.88, respectively.[278] During the brief period in 2015 during which Davis was employed by Schlumberger, his total compensation for the year was $50,566.15.[279]

As with the other DDs, Davis did not physically control the drill or the drill the well—the Drillers employed by the client did that.[280] Instead, Davis instructed the Driller how to steer the BHA.[281] The rig crew physically assembled the BHA, and Davis oversaw and instructed the rig crew on the assembly process.[282] The Driller physically lowered the BHA into the hole, not Davis.[283]

---

[274] ECF No. 546, Exhibit 1, Davis Deposition, at pp. 11-12.
[275] *Id.*, at pp. 20 – 22 & attached exhibits 2 through 4.
[276] *Id.*, at p. 18.
[277] *Id.*
[278] *Id.*, at pp. 20-23; Exhibit 2, Marroquin Declaration at ¶¶ 11 – 13 & attached exhibits 2-5 – 2-8.)
[279] *Id.*
[280] *Id.*, at pp. 27, 46.
[281] *Id.*, at p. 46.
[282] *Id.*, at p. 48.
[283] *Id.*, at p. 49.

Davis was also responsible for ensuring that the directional drilling aspect of the client's drilling operation was done correctly. If corrections or adjustments to the BHA's trajectory were required, Davis directed the Driller to perform corrective actions that Davis determined were necessary, such as changing the weight on bit, slowing the rate of penetration, or turning the tool-face.[284] Davis used his experience to determine what changes were necessary; there was no checklist or procedural list for Davis to follow.[285] According to Davis, neither the company representative nor the Driller overrode his decisions and instructions to the Driller.[286] During drilling, Davis continuously monitored the progress of the drilling through survey data and used this data to make his decisions and instructions about what action, if any, was needed to keep the BHA within the well plan.[287]

Schlumberger contends that Davis' job duties satisfy the "job duties" requirements for the HCE exemption and that the exemption applies as a matter of law. The Court agrees. Davis' annual compensation exceeded $100,000 per year of which over $455 per week was paid on a salary basis. To satisfy the "job duties" requirement of the HCE requirement, Schlumberger need only establish that Davis customarily and regularly performed one or more of these exempt duties or responsibilities. The summary judgment record establishes that Davis customarily and regularly performed one or more responsibilities of both an executive and administrative employee. His duties were not manual, and he customarily and regularly performed at least one exempt duty or responsibility under the executive or administrative exemptions.

Davis customarily and regularly performed as an advisor and consultant to Schlumberger's customers. Davis' job duties included planning, executing, and managing all phases of the

---

[284] *Id.*, at p. 51.
[285] *Id.*, at p. 51.
[286] *Id.*, at pp. 51-52.
[287] *Id.*, at p. 53.

directional drilling job to deliver services that meet client expectations. His job duties included ensuring that the directional drilling job was performed correctly.[288] He instructed the Driller as to how to "steer" the well.[289] He also consulted with clients on the drilling process and developed solutions for any problems encountered; these duties affected and implemented the customer's operating practices.[290] Further, Davis's supervision of the rig crew during the directional drilling operation was an administrative function.

Considering the summary judgment record, Schlumberger has established that the HCE exemption applies to Davis. Plaintiffs have not come forward with summary judgment evidence sufficient to create a genuine question of material fact as to the application of the HCE exemption. The Court therefore GRANTS Schlumberger's motion for summary judgment with respect to Davis.

## V.
## GOOD FAITH AND WILLFULNESS

Plaintiffs and Schlumberger seek a summary judgment ruling on the issue of whether any violations committed by Schlumberger were willful and whether Schlumberger acted in good faith. The Court concludes that a ruling on good faith and willfulness is premature at this time unless and until there has been a finding that a violation has occurred. Accordingly, both motions addressing these issues are denied as premature.

## VI.
## CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment Regarding Schlumberger's Exemption Defenses [ECF No. 552] filed by Plaintiffs is DENIED. The Motion

---

[288] *Id.*, at p. 48.
[289] *Id.*
[290] *See* 29 C.F.R. § 202 (b).

for Summary Judgment as to Plaintiff Hani Anklis [ECF No. 540], the Motion for Summary Judgment as to Plaintiff Michael Ainsworth [ECF No. 541], the Motion for Summary Judgment as to Plaintiff Gadi Ogbogu [ECF No. 542], the Motion for Summary Judgment as to Plaintiff Thomas Naron [ECF No. 543], the Motion for Summary Judgment as to Plaintiff Brian Dankowski [ECF No. 544], the Motion for Summary Judgment as to Plaintiff Joshua Eaton [ECF No. 545] and the Motion for Summary Judgment as to Plaintiff James Davis [ECF No. 546] filed by Schlumberger are all GRANTED. The Motion for Summary Judgment as to the Issues of Good Faith and Willfulness [ECF No. 534] filed by Schlumberger and the Motion for Partial Summary Judgment as to Schlumberger's Good Faith Affirmative Defense [ECF No. 556] filed by Plaintiffs are both DENIED AS PREMATURE.

THUS DONE in Chambers on this 30th day of March, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE