# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | |
|---|---|
| **BROCK BOUDREAUX, ET AL.** | **CIVIL ACTION NO. 6:14-2267** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **SCHLUMBERGER TECH. CORP.** | **MAGISTRATE JUDGE WHITEHURST** |

## REPORT AND RECOMMENDATION

Pending before the undersigned on referral from the district judge is the Renewed Motion to Decertify the Conditional Class [Doc. 631] filed by Schlumberger Technology Corporation ("STC"). The motion is opposed by the plaintiffs [Doc. 639], and STC filed a reply brief [Doc. 646]. For the following reasons, it is recommended that the Motion to Decertify be GRANTED.

### I. Background

This lawsuit was filed on July 8, 2014 as an action under the Fair Labor Standards Act ("FLSA, 29 U.S.C. §201, *et seq.*[1] The FLSA sets a general

---

[1] In the original Complaint, the plaintiffs also asserted claims under California state law. After the only named plaintiff who specifically alleged grounds for a California state law claim (Khalid Barake) settled his claims with STC and was dismissed from the case, this Court ruled that the Opt-In Plaintiffs did not become parties to those state law claims solely by opting into the FLSA collective action under Section 216(b). Because Mr. Barake had been dismissed from the case, and because the Court had not certified a Rule 23 class with respect to the state law claims, this Court concluded that the California state law claims asserted in the case must be dismissed. *See* Doc. 627.

minimum wage for employees engaged in commerce. 29 U.S.C. § 206(a)(1). Section 207(a) requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily defined maximum hours. 29 U.S.C. § 207(a). The FLSA creates a cause of action for violations of provisions of the Act, which include the minimum wage and overtime provisions. 29 U.S.C. § 216(b).

The plaintiffs allege that they were misclassified as exempt and that they have therefore been denied overtime pay as a result of a "widespread corporate policy that uniformly misclassifies them as exempt from the FLSA overtime provisions, regardless of any individualized factor such as experience, age, job duties, or geography." [Doc. 33, p. 2]. They assert that, as a result of STC's classification decision, STC paid all putative class members a salary plus day rate basis, with no overtime pay. Plaintiffs seek to recover unpaid overtime wages, liquidated damages, attorney fees, and costs owed to them.

On February 25, 2015, this Court certified two classes: 1) Directional Drillers ("Drillers") and 2) Measurement While Drilling ("MWD") and Logging While Drilling ("LWD") Operators (both referred to collectively as the "Operators.") [Doc. 52]. On August 30, 2019, the claims of the Operator Class were dismissed with prejudice, those parties having reached a settlement with STC

2

as to those claims [Doc. 464].   Therefore, the only remaining claims in this matter are the claims of the Directional Drillers [DDs].

The movant explains the work of DDs as follows:

DDs support the drilling of wells owned by Drilling and Measurements Segment ("D&M") customers, who are oil and gas exploration companies. The customer's general business operations involve producing oil and gas.  STC's business is to advise those customers on how to best mange the drilling of productive gas wells. DDs are a crucial source of advice on how to drill the well.  In fact, the wells would not hit the pay zone, the oil or gas reservoir, without guidance from the DD.  Directional Drilling, as contrasted from vertical well drilling, involves "steering" the Bottom Hole Assembly ("BHA") of the drill string to alter the path of the well.  This may be done to avoid obstacles, such as faults or difficult to drill formations, avoid other wells near the well path, or to follow the contours of the "pay zone" or hydrocarbon reservoir to increase production from that well.[2]

STC filed its original Motion to Decertify the Conditional Class (the "Original Motion") on May 14, 2021 [Doc. 538].  On February 23, 2022, the undersigned denied that motion without prejudice to the right to refile the motion after the pending motions for summary judgment had been adjudicated, citing the interests of judicial efficiency and the potential for overlap between the summary judgment motions and the decertification motion [Doc. 621].

On March 21, 2022, the district judge granted summary judgment in favor of STC on the claims of fifteen (15) plaintiffs, finding that they had waived their right

---

[2] *See* STC's Motion to Decertify, Doc. 631, at p. 7.

to participate in a collective action [Doc. 622]. On March 30, 2022, the Court granted summary judgment on the merits in favor of STC under the Highly Compensated Employee ("HCE") exemption as to seven plaintiffs: Michael Ainsworth, Hani Anklis, Gadi Ogbogu, Thomas Narron, Brian Dankowski, Joshua Eaton, and James Davis [Doc. 629]. With these two rulings, this Court has dismissed the claims of 22 plaintiffs.

In its newly-urged Motion to Decertify, STC argues that there are now 94 opt-in plaintiffs and no named plaintiffs in this case. STC argues that all ninety-four (94) meet the minimum salary requirement for exempt employees, and seventy-seven (77) meet the total compensation requirements for the highly compensated employee exemption ("HCE") for the entire relevant period. Most importantly for the purposes of the instant motion, STC argues that the primary duties of the DDs in this case differ based upon their job location, as well as a number of additional factors.

## I.  Law and Analysis

Section 216 of the FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is

4

brought." 29 U.S.C. §216(b). "A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Hoffmann–LaRoche v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *see also Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir.2003) ("Congress' purpose in authorizing §216(b) class actions was to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer").

Like many district courts in the Fifth Circuit, this Court utilized the two-tiered approach for determining whether to conditionally certify a collective action set out in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) *rejected by Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021). The first step of the *Lusardi* approach addresses notice to potential members of the collective action based on a conditional certification which, upon filing of a later motion to decertify, would be subject to a more rigorous factual determination as to whether the original plaintiffs and the opt-in plaintiffs are similarly situated. 118 F.R.D. at 353-54. In January 2021, the Fifth Circuit decided *Swales*, which rejected the two-step certification process under *Lusardi*.

5

This case has proceeded through the typical two-tiered approach and the Court now faces a motion to decertify.  Between the filing of the motion and its resolution, the Fifth Circuit "reject[ed] *Lusardi*'s two-step certification rubric" for courts under its province.  *Swales*, 985 F.3d at 434.  After *Swales*, "[i]nstead of adherence to *Lusardi*, or any test for 'conditional certification,' a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize preliminary discovery accordingly."  *Id.* at 441. The courts should consider, "early in the case, whether merits questions can be answered collectively." *Id.* at 442.  Further, when determining "whether and to whom notice should be issued in th[e] case, the district court needs to consider all of the available evidence."  *Id.*

Although there has been a significant shift in the law regarding certification since the filing of this case, the current state of this case – like many cases wherein conditional certification was granted prior to *Swales* -- essentially remains the same as it would have been pre-*Swales.*  This is so, because "[p]ost-*Swales*, the question the Court must answer now is the same question it would ask at the second stage of the *Lusardi* analysis: are plaintiffs and the opt-ins sufficiently 'similarly situated' such that this case should proceed on a collective basis?"  *See,*

6

*e.g., Juan Segovia & Victor Flores v. Fuelco Energy LLC*, 2021 WL 2187956, at *6 (W.D. Tex. May 28, 2021), *citing Badon v. Berry's Reliable Res., LLC*, 2021 WL 933033 at *3 (E.D. La. Mar. 11, 2021); *accord Hernandez*, 2021 WL 1146005, at *2 (quoting *Badon*).

The FLSA does not define what it means for employees to be "similarly situated;" nor has the Fifth Circuit defined the term.   Both before and after *Swales*, however, courts have repeatedly stressed that plaintiffs must only be similarly – not identically – situated to proceed collectively.  *See, e.g., Hipp*, 252 F.3d at 1217; Reyes, 2007 WL 101808, at *1; *Hill v. Muscogee County School Dist.*, 2005 WL 3526669, at *2 (M.D. Ga. 2005); *Basco v. Wal–Mart Stores, Inc.*, 2004 WL 1497709, at *5 (E.D. La. 2004); *Frank v. Capital Cities Communications, Inc.*, 1983 WL 643, at *2 (S.D.N.Y. Oct. 11, 1983), as follows:

> . . . the pertinent inquiry is whether the plaintiffs have "demonstrated similarity among the individual situations." *Id.* They may do that by showing "some factual nexus which binds" them and opt-in plaintiffs (or potential opt-in members depending on timing of the inquiry) as alleged victims of a particular policy or practice. *Id.*; *accord Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008) (utilizing same nexus approach). Thus, "hearing the cases together furthers the purposes of [the statute], is fair to both parties, and does not result in an unmanageable trial." *Vanzzini*, 995 F. Supp. 2d at 720.

*Segovia*, 2021 WL 2187956 at *8.

7

Despite the change in the certification process, the factors used by courts to determine whether plaintiffs are similarly situated still inform the question of whether a lawsuit should proceed collectively: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See, e.g., Badon v. Berry's Reliable Res., LLC*, 2021 WL 933033, at *3 (E.D. La. Mar. 11, 2021). *Swales* held that "plaintiffs have the burden of demonstrating that plaintiffs and opt-ins are similarly situated." *See Badon*, 2021 WL 933033, at *2; *Mondeck v. LineQuest, LLC*, 2021 WL 7184965, at *3 (W.D. Tex. Nov. 5, 2021), *report and recommendation adopted*, 2021 WL 7184964 (W.D. Tex. Dec. 14, 2021).

If the court determines that they are not similarly situated, the opt-in plaintiffs are dismissed without prejudice, and the lead plaintiff proceeds to trial on his individual claims. *See Burke v. Mgmt. & Training Corp.*, 2018 WL 4038115, at *1 (N.D. Miss. Aug. 23, 2018). Finally, the decision whether to decertify a collective action is within the district court's discretion. *See, e.g., Juan Segovia*, 2021 WL 2187956, at *8 (W.D. Tex. May 28, 2021) (courts "possess broad discretion related to collective action matters, including when applying the legal standard for determining whether to permit a proposed group or subcategory of the

proposed group to proceed as a collective action because the group is similarly situated…").

### A.    Dismissal of Ainsworth

STC argues first and foremost that a condition precedent to maintaining a collective action is the viability of the named plaintiffs' FLSA claims, averring that without viable claims, the named plaintiffs cannot represent others they allege are similarly situated.   STC argues that because Michael Ainsworth was dismissed as the lead plaintiff, there is no plaintiff with a viable FLSA claim who can represent other plaintiffs who contend they are similarly situated, and this action cannot proceed collectively.

The lead plaintiff in a collective action "bears the burden of showing that [he] and the opt-in plaintiffs are similarly situated." *Burke v. Mgmt. & Training Corp.*, 2018 WL 4038115, at *2 (N.D. Miss. Aug. 23, 2018), *citing White v. Baptist Mem. Hlth. Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012); *see also Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008).   If the lead plaintiff fails to carry his burden, the collective action should be decertified.   *Burke*, 2018 WL 4038115, at *2, *citing White*, 699 F.3d at 878.

In *White*, the Sixth Circuit affirmed a decision of the district court granting summary judgment in favor of a hospital on the lead plaintiff's (a nurse) individual

9

FLSA claim, and thereafter decertified the FLSA collection action, finding that without a viable FLSA claim, the nurse could not represent others whom she alleged were similarly situated in FLSA class action.   This holding was echoed in *Mondeck* 2021 WL 7184965, at *4, wherein the district court held that a legal analysis of the decertification question was not even necessary given the "procedural posture" of the case, which reflected that the lead plaintiff had been dismissed after having been found to have no viable FLSA claim.[3]   The *Mondeck* court held that decertification was mandated by the lack of a lead plaintiff.

In the instant case, STC argues that the dismissal of Ainsworth places this case in the procedural postures of both *White* and *Mondeck*, and that decertification on this basis alone is required.   The undersigned agrees but finds that even without the lack of a representative plaintiff, decertification is appropriate, as the plaintiffs fail to sustain their burden of showing that they are similarly situated.

**B.**     **Analysis of the "Similarly Situated" Factors**

**1.**     **Factual and employment settings**

With respect to the first factor, "[t]he extent to which opt-in plaintiffs' work experiences differ directly influences [the employer's] capacity to prove its

---

[3] Unlike this case, in *Mondeck*, the plaintiffs did not file a motion to substitute another plaintiff for the lead plaintiff.   In this matter, the plaintiffs filed a motion for leave to amend to substitute Mark Naron as the lead plaintiff for William Ainsworth, however, that motion for leave to amend was denied by this Court on October 18, 2022 [Doc. 653].

statutory defense." *Burke*, 2018 WL 4038115 at \*2, *citing Johnson*, 561 F. Supp 2d at 574. Moreover, "the more dissimilar plaintiffs are and the more individuated [the employer's] defenses are, the greater doubts there are about the fairness of a ruling on the merits -- for either side -- that is reached on the basis of purportedly representative evidence." *Id.* The similarly-situated inquiry requires courts to examine each opt-in plaintiffs' job duties "in light of the exemption criteria. *Id.*

As stated hereinabove, courts have stressed that "similarly situated does not mean identically situated." *Crain v. Helmerich & Payne Int'l Drilling Co.*, 1992 WL 91946, at \*2 (E.D. La. Apr. 16, 1992); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 535–36 (S.D. Tex. 2008). In *Falcon*, the court stated that "[a]t a minimum, there must be "meaningful 'identifiable facts or legal nexus [that] bind the claims,' so that hearing the cases together furthers the purposes of section §216, is fair to both parties, and does not result in an unmanageable trial." 580 F. Supp. 2d at 535–36. Slight differences in job duties or functions do not run afoul of the similarly situated requirement." *Tolentino v. C&J Spec-Rent Serv., Inc.*, 716 F.Supp.2d 642, 652 (S. D. Tex. 2010).

In the instant case, STC argues that there are several components of each DDs' job description that make them dissimilar. First, STC argues the plaintiffs'

total compensation varied, and that while all DDs are highly skilled and all exercised discretion, some qualified for HCE and others did not, and those qualifying for HCE are not a uniform class. STC contends that the plaintiffs had different job assignments and, therefore, performed different duties; they worked in different locations; and they used different equipment. STC argues that some DDs function as lead DDs, some as second DDs, or DDXs (cross-trained DDs); that lead DDs have managerial duties that second DDs and DDXs do not have; and that DDXs can perform MWD duties instead of DD duties, or a mix of MWD and DD duties, or only DD duties.[4] STC further argues that some DDs are assigned to special projects, and that all senior DDs seeking promotion to grade 11 complete a research project and appear before a board to determine if the project warrants their advancement. The length of the special project will vary and may range from researching equipment modifications while still performing field duties to extensive research projects that may involve extended overseas travel. Highly experienced DDs are designated as subject matter experts and are the primary consultant person for all other DDs, and they would be routinely contacted by

---

[4] MWD is a job that involves primary responsibility for gathering and analyzing surveys and logging data for the MWD and the customer to use. In conditionally certifying this action, the Court recognized that MWDs belong in a different class; as stated hereinabove, all MWDs settled their claims with STC and were dismissed from this case.

other DDs for advice.  DDs this experienced may be relieved of their normal duties altogether for extended periods and placed in training or other roles.

In response to the motion, plaintiffs do not refute any of the factual information set forth by STC concerning job duties.  Rather, plaintiffs argue that the common element that binds the plaintiffs for purposes of the "similarly situated" analysis is that all of the plaintiffs were paid a salary plus received additional bonuses for services provided to customers.  Plaintiffs argue that the payments were unlawful because they violate the reasonable relationship test stated in 29 C.F.R. 541.604(b).  As pointed out by STC in its reply brief, however, the Court has already ruled that STC's hybrid compensation structure does not require application of the reasonable relationship test.  Indeed, the Court held that one or more of the white-collar exemptions may apply to the plaintiffs if STC establishes that the minimum weekly guaranteed compensation requirement had been met and that the job duties test is satisfied.

To this end, STC filed seven motions for summary judgment as to plaintiffs Michael Ainsworth, Hani Anklis, Thomas Naron, Brian Dankowski, Joshua Eaton, Gadi Ogbogu, and James Davis, arguing that each was exempt under the HCE administrative exemption.  The Court granted each summary judgment motion, finding that each plaintiff was properly classified as exempt, but for different

reasons.[5]   Some plaintiffs qualified as exempt under the HCE exemption because they performed one or more executive duties, and others were exempt because they performed administrative duties.

With respect to the differences in assignments, equipment used, and work location of the DDs, STC argues as follows:

### Assignments

- Some DDs work at the customer's rigs as part of a STC Drilling and Management ("D&M") cell.[6]  The cell may be composed of three or four D&M employees.[7] DDs are usually paired with MWDs.[8] The MWDs primarily analyze data transmitted from sensors attached to the BHA, which provide the BHA's exact location underground as well as information about the geologic formation, down-hole environment, and status of the equipment.[9]  The DDs at the rig use this information to conduct their own analysis and determine the instructions that they will give to the rig crew.[10] When STC is providing full onsite support to the client, the D&M cell will usually consist of four employees, two DDs and two MWDs, each working twelve hour shifts to provide support to the twenty-four hour drilling operation. [11]

---

[5] *See* Memorandum Ruling, Doc. 629.

[6] *See* Declaration of Mathieu Francois Van Vliet, a Workforce and Strategic Planning Manager at STC, attached to Motion to Decertify, Doc. 631, as Exhibit 6, at ¶6.

[7] *Id.* at ¶8.

[8] *Id.*

[9] *Id.* at ¶13.   *See also* deposition of Alfonso Habeych, attached as Exhibit 7 to Doc. 631, at pp. 45-51.

[10] Ex. 6 at ¶13.

[11] *Id.* at ¶8: *See also* deposition of Luke A. Kuwertz, attached as Exhibit 3 to Doc. 631, at p.

Sometimes STC will provide a reduced, or three-man crew.[12] In these circumstances, either one crew member will be "cross trained" as both a DD and MWD and perform both roles, or this "fourth position" will be filled by a DD or MWD located at a Remote Operation Center ("ROC"), who monitors the rig operations and provides instructions to the rig crew via a computer link.[13]

- Some DDs work at a Remote Operations Center ("ROC"), an STC office building. ROC DDs are responsible for performing the DD role at 3-5 wells simultaneously. [14] Because they are not physically present at the well, there are some DD functions that they cannot perform, including visual oversight and supervision of the rig crew in assembling the BHA and inspecting the BHA.[15] Conversely, the DD in the ROC is concurrently reading the telemetry from three to five different wells, analyzing that telemetry, and making decisions as to the instructions to give to the 3-5 separate drillers controlling the drilling operation.[16]

- Some DDs work in STC's Operations Support Center ("OSC"), which, like the ROC, is an office environment. DDs at an OSC support the DDS at the rig and are responsible for monitoring 30-40 rigs at the same time.[17] These DDS are the most experienced DDs in the company.[18]

---

275.)

[12] Ex. 6 at ¶8.

[13] *Id.* at ¶¶8, 17, 19.

[14] *Id.* at ¶17.

[15] *Id.*

[16] *Id.*

[17] *Id.* at ¶17.

[18] *Id.*

- DDs at the rig and in the ROC directly support and interact with STC's customers. DDs in the OSC support and interact with other DDs.[19] DDs in the ROC and OSC work in office buildings. DDs working at the rig perform some manual work, such as measuring the tools.[20] DDs working office support or on special projects do not do any of the above.[21]

- DDs can function as lead DDs, second DDs, or DDXs.[22] Lead DDs have managerial duties that second DDs and DDXs simply do not have. DDXs can perform MWD duties instead of DD duties, or a mix of MWD and DD duties, or only DD duties. MWD is a completely different job that involves primary responsibility for gathering and analyzing surveys and logging data for the MWD and the customer to use. In conditionally certifying this action, the Court recognized MWDs belong in a different class.[23]

STC argues that different DDs use different equipment, depending on whether the wells use a mud motor or a rotary steering system, as described below:

### Equipment

- Wells employing a mud motor are "hands off" for the DD during the actual drilling. The DD controls the drilling by controlling the driller. DDs instruct the driller whether to

---

[19] *Id.* at ¶18.

[20] *Id.* at ¶¶9-16.

[21] *Id.* at ¶17.

[22] *Id.* at ¶¶16, 19.

[23] *Id.* at ¶¶19-21.

slide or rotate, how fast, how much weight to put on bit, and how much pressure for the drilling fluid.[24]

- DDs working with a rotary steerable system also have a computer programming component to their job. These DDs program the rotary steerable system at the start of drilling and reprogram as the drilling is ongoing to adjust to changing conditions, while still telling the Driller to adjust weight on bit or pump speed. This adds technical and judgment aspects to the job that do not apply to DDs using the mud motor.[25]

Finally, STC argues that the location of each DD's job directly impacts the amount and type of judgment that each DD makes on the job, as follows:

## Location

- DDs working offshore work in a management by committee environment. They still serve as consultants to the customer and their recommendations are given significant weight, however, any issues that may impact other contractor operations are discussed with the committee.[26]

- On the other hand, DDs working onshore function much more as autonomous decision makers. Differences in rock strata in different basins simplify or complicate the factors that DDs must consider, and the degree of judgment required.[27]

STC argues that the variety of job assignments (rig, ROC, OCS, and other), the level of specific roles that can be played by DDs (lead, second, DDX), the two

---

[24] *Id.* at ¶23.

[25] *Id.* at ¶24.

[26] *Id.* at ¶26.

primary equipment variants (mud motor and rotary steerable system), and the location variables (offshore, Permian, Bakken, Southeast Texas, mid-continent, Northeast, and California/Alaska) results in up to 168 possible combinations of scenarios in which DDs perform their jobs for STC, all of which subjects each DD to a unique compensation scheme, and, for the purposes of this lawsuit, different defenses to their claims by STC.

After a review of the record before the court, the undersigned finds that there is no significant common evidence that exists to enable the court to determine, on a collective basis, whether all DDs – as a group -- are exempt from the FLSA overtime provisions.  The different assignments, equipment used, and locations of the DDs would require the Court to engage in highly fact-specific analyses to determine whether which exemption applies to each individual plaintiff.  The job duties of the plaintiffs are not homogenous and do not lend themselves to a collective action.

### 2.    Individualized defenses

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D.Md.2007).  With regard to this factor, courts are concerned

---

[27] *Id.* at ¶17.

with whether representative evidence can be used to make class-wide determinations and the extent to which resolution "requires such individualized inquiries that the case cannot proceed collectively." *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014), *citing Roussell v. Brinker Int'l, Inc.*, 2008 WL 2714079, at \*21 (S.D.Tex. July 9, 2008), *citing Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 585–87 (E.D.La.2008). However, "[j]ust because the inquiry [under the asserted defense] is fact-intensive does not preclude a collective action where plaintiffs share common job traits." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11ᵗʰ Cir.2008). The presence of defenses that require individualized inquiries does not necessarily require decertification if common issues and facts predominate, and the court finds that other factors indicate that plaintiffs are similarly situated and proceeding as a collective action would be appropriate. *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1107 (10 Cir.2001) (finding that the existence of highly individualized defenses did not outweigh the benefits of proceeding as a class action).

In the instant matter, STC has set forth significant evidence that the three exemptions at issue in this case – the administrative exemption, the executive exemption, and the HCE exemption – differ by plaintiff, and can actually change

over time with respect to an individual plaintiff as that plaintiff's compensation level and duties change over time.   STC argues that a fact-specific analysis of each plaintiff's duties and responsibilities is necessary to determine which exemption is applicable at any given point in time, particularly with respect to the HCE exemption, which will require an examination of an individual plaintiff's management activities.   STC argues that each exemption has different elements requiring different evidence, and that the proof as to each claim is not common to all class members.

In *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 284 (N.D. Tex. 2008), an FLSA overtime case, the district court noted that disparities with regard to plaintiffs and the amount of time they spent working off the clock mandated decertification, noting: "The [p]laintiffs have worked in settings that vary from store to store, manager to manager, and day to day. The defenses that the [d]efendant will offer vary with these factual disparities."   Similarly, in *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709 (E.D. La. July 2, 2004), the district court addressed this issue from a different legal perspective, considering whether a class of Wal-Mart employees should be conditionally certified.   Examining the issue of whether the named plaintiffs and opt-in plaintiffs were similarly situated, the Court explained:

> Furthermore, Wal-Mart's potential defenses to any alleged FLSA overtime violations will require highly individualized evidence concerning each associate. As stated in *Mooney,* 54 F.3d 1213, n. 7 "the disparate individual defenses asserted by [defendant] heightens the individuality of the claims and complicates the significant management problems." . . . . The members of the proposed class come from different departments, groups, organizations, sub-organizations, units and local offices within the Wal-Mart organization. The potential opt-in plaintiffs performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis. This case should not be certified; it would be an exercise in gross mismanagement of judicial and litigant time and money to certify the class as requested given the overwhelming evidence brought before the court.

*Basco*, 2004 WL 1497709 at *8.  *See also Burke v. Mgmt. & Training Corp.*, 2018 WL 4038115, at *3 (N.D. Miss. Aug. 23, 2018) ("To properly defend itself, MTC would have to "pick the class apart, plaintiff by plaintiff, going into the day-to-day duties of each of the plaintiffs to prove that these [lieutenants] are properly classified as exempt."); *Gomez v. Mi Cocina Ltd.*, 2017 WL 3334106, at *4 (N.D. Tex. Aug. 4, 2017) ("The defenses that Defendants will likely offer at trial would be equally individualized and will vary with the factual dissimilarities among the Opt-In Plaintiffs. Under these circumstances, the court concludes that decertification of the class is appropriate. Case management and procedural fairness require this result.").

In this instant case, the undersigned concludes that the disparate factual scenarios surrounding the different work environments and job responsibilities of the DDs would require a highly fact-specific analysis of each plaintiff's duties and responsibilities in order to determine which exemption is applicable at any given point in time. Thus, the parties would be conducting separate minitrials to resolve each individual's claim. Such a scenario eliminates any judicial efficiency that might be gained through a collective approach.

### 3.    Fairness and Procedural Considerations

Under this factor, the Court considers 'the primary objectives of the FLSA §216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity.'" *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 742-43 (W.D> Tex. 2018), *quoting Reyes v. Texas Ezpawn, L.P.*, 2007 WL 101808, at *1 (S.D. Tex. Jan. 8, 2007).

Here it is evident that the factual and employment settings of the plaintiffs are far too varied for trial before a single jury:  In *Gatewood v. Koch Foods of Mississippi, LLC*, the court stated:

> The court agrees that this collective action would be unmanageable because "this case is fraught with questions requiring distinct proof as to individual plaintiffs."  "Indeed, a collective action is designed to

22

permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability."

2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009) (internal citations omitted).

In this case, the undersigned finds that the factual disparities among the plaintiffs would make it difficult, if not impossible, to coherently manage the class in a manner that will not prejudice any party, a situation that is all the more evident given that there is no representative plaintiff in this matter. Proceeding as a collective action would be unmanageable because this case is fraught with questions requiring distinct proof as to individual plaintiffs, which was evident during the adjudication of the motions for summary judgment as to seven individual plaintiffs whose claims have already been dismissed by the district judge. Because the plaintiffs' claims are not amenable to generalized evidence, any benefit to maintaining a collective action is undercut by the unmanageability of a trial in which individualized defenses must be presented by STC as to each plaintiff. Simply put, this action is unsuitable for collective treatment under §216(b). Where, as here, "there are significant differences in employment experiences, the procedural advantages of a collective action evaporate, and the court's ability to render a just verdict on the merits is seriously undermined."

*Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2s 567, 588 (E.D. La 2008).   Thus, fairness and procedural considerations weigh in favor of decertification.

For the foregoing reasons, the undersigned concludes that the plaintiffs are not similarly situated in this matter, and the case should be decertified. Consequently, it is recommended that the claims of the opt-in plaintiffs be dismissed without prejudice.

### III. Conclusion

Considering the foregoing and based on an exhaustive review of the record and the extensive briefing of the parties, the undersigned recommends that the Renewed Motion to Decertify the Conditional Class [Doc. 631] filed by STC be GRANTED, and that the claims of the opt-in plaintiffs be dismissed without prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5 thCir.1996).

Signed at Lafayette, Louisiana, this 14th day of November, 2022.


**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

25